# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------X

DELAWARE DISPLAY GROUP LLC and
INNOVATIVE DISPLAY,

        Plaintiff,

                    Case No. 13-CV-2109-RGA

  vs.

LG ELECTRONICS INC., LG
ELECTRONICS U.S.A., INC., LG
DISPLAY CO., LTD., AND LG
DISPLAY AMERICA, INC.,

        Defendants.

------------------------------X

RESTRICTED - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF WILLIAM BOHANNON

SAN FRANCISCO, CALIFORNIA

AUGUST 3, 2016

9:17 A.M.

REPORTED BY:
PATRICIA L. HUBBARD, CSR #3400
Job No. 45671

WILLIAM BOHANNON - RESTRICTED - ATTORNEYS' EYES ONLY

266

**infringe is performing substantially the same function, correct?**

A.  Well, I think that my demonstrative pictures where I took pictures of an illuminated panel member where the light's bouncing off of everything around it, I think it's a pretty good illustration of what's -- what's used and what's needed to reflect light back into the panel member.

So, it's kind of a -- of a -- you know, catch-all phrase, but obviously, you know, if -- if you don't find it meets literally, I feel that because of the doctrine of equivalents that they still do the same function of forcing light back into the panel member that would otherwise escape.

**Q.  Is it true for all your statements with respect to the doctrine of equivalents in your report that it's kind of a catch-all?**

A.  It's kind of a catch-all.  You know, I hate to be an absolute, especially with you, because I'm sure there's a catch there floating around somewhere, but I don't have -- I don't have something -- I don't have something that I don't feel literally infringes.

The tear-down charts and the CAD files in my opinion show literal infringement where all

267

the claim elements are met.

**Q.  And beyond the evidence you've put forward to show that, you don't have anything else to show that if you're wrong, there is an equivalency argument other than these catch-all paragraphs?**

A.  Well, that's probably a little bit too -- too strong of a statement.

I think that the demonstrative pictures that I take where you see light coming all around on an illuminated panel member are a really good illustration of what's needed.

And if you look at any operating LCM, which an LCM consists of a backlight together with a LCD, if you look at them operating, light is not streaming out of them.  The light is contained, the light's being reflected back, and the light's being recycled perhaps and coming back up through the panel member.

So I feel that it exists in literal form and would have to exist in an equivalent form.

**Q.  Take a look at page 84 of your reply, please.**

A.  84.  Okay.

**Q.  Are you there?**

268

A.  Yeah.  I was -- I was just trying to see what the context was.

**Q.  Yeah.  I think this -- correct me if I'm wrong, but this relates to the claim language with respect to structural features.**

A.  Uh-huh.

**Q.  So, if you take a look at page 84, the first written --**

A.  Oh, 84.

**Q.  -- element there, it says, "The yellow highlighting shows where the LCD fits on the top of the tray such that the tray provides a mount for the LCD."**

A.  Yes, I see that.

**Q.  So, it's your opinion that an LCD sitting on top of a tray provides a structural feature for mounting the LCD?**

A.  Well, please note that this is not just sitting on top loosely.  There's -- the structural features are some of these -- I'm going to hold it up and point to it so I can be clear.

See the parts that are highlighted here in yellow (indicating)?

**Q.  Uh-huh.**

269

A.  So there's -- this is again one of those cross-sectional views, so you're only seeing like a thin slice through some point.  We'd have to look at the full CAD files to see where this even corresponds to the slice -- cross-sectional slice through something.

But what I'd like to point out here is here you see this is kind of a ridge or an additional extended part of walls that are used to hold that LCD in place.

You don't -- that kind of stuff is necessary.  So when you -- if this was your laptop display and you turn it like this (indicating) or you turn it like that (indicating), you don't want the thing sliding out of position.

**Q.  So what in the highlighted section on the left provides the mount?**

A.  So the -- the left?

**Q.  The left -- I'm sorry.**

A.  The other left over here (indicating)?  So you can see that this is a -- this is kind of a little step that acts as a receiver for the LCD on that side just like there's kind of a step that acts as a receiver for the LCD on this side over here (indicating).

68 (Pages 266 to 269)

WILLIAM BOHANNON - RESTRICTED - ATTORNEYS' EYES ONLY

331

That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 5th day of August, 2016.

PATRICIA L. HUBBARD, CSR #34

# EXHIBIT E

337

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------X

DELAWARE DISPLAY GROUP LLC and
INNOVATIVE DISPLAY,

        Plaintiff,

                      Case No. 13-CV-2109-RGA

  vs.

LG ELECTRONICS INC., LG
ELECTRONICS U.S.A., INC., LG
DISPLAY CO., LTD., AND LG
DISPLAY AMERICA, INC.,

        Defendants.

-------------------------------X

RESTRICTED - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF WILLIAM BOHANNON

SAN FRANCISCO, CALIFORNIA

AUGUST 4, 2016

9:08 A.M.

REPORTED BY:
PATRICIA L. HUBBARD, CSR #3400
Job No. 45673

WILLIAM BOHANNON - RESTRICTED - ATTORNEYS' EYES ONLY

458

A. This is my reply report.

Q. 15 is the next page, I think.

A. So William Bohannon's Reply Report.

Q. That's 15.

A. Page 15.

Q. Yes. Is that a picture or is that a graphical depiction?

A. That's a picture.

Q. All right. So that's --

A. That's a photograph.

Q. All right. So that's a photograph of one of the -- is it a photograph of one of the Vizio accused products?

A. I'm trying to see.

Q. Well, you cited TD-32 on the next page, if that helps.

In fact, let me see if I have TD-32, because that may be a bigger --

A. I guess TD-32 is a --

MR. LO: Hang on one second. She's not writing yet.

THE WITNESS: Oh, we've got one.

THE REPORTER: This is Exhibit 26.

(Whereupon the document referred to was marked Defendants'

459

Exhibit 26 by the Certified Shorthand Reporter and is attached hereto.)

THE WITNESS: Thank you.

BY MR. LO:

Q. All right. So --

A. On page 16 it says -- this -- that picture I guess is from TD-32 page 24.

Q. Yeah. So let's turn there.

All right. So let's take a look at Exhibit 26, which is TD-32. And on there you've got a photograph of a portion of the -- one of the Vizio accused products, correct?

A. Yes.

Q. And it's a 40-inch -- 42-inch television product, yes?

A. Yes. It appears to be the M420KD.

Q. All right. Now, on page 24 of TD-32 you've got a section that is blocked out in green.

Do you see that?

A. I do.

Q. And that is the -- what you describe as the transition region, correct?

A. That's true.

Q. And the transition region includes some

460

stripes on the front side, correct?

A. Yeah. Although they call out -- we call it linear optical elements.

Q. All right. So you'll call that a linear optical element.

A. See right next to where -- the yellow part there by your left hand.

Q. Yes.

A. Further down. Right in there.

Q. All right. And then you've got a section that's blocked out in blue, and you call that the output region, correct?

A. That's correct.

Q. And you say in this -- in your annotation that the output region has dots on the back and then stripes on the front, right?

A. That's correct.

Q. The stripes on the front, are those also a linear optical element?

A. Well, we call those the -- the deformities, the linear deformities.

Q. Okay.

A. So the -- the nomenclature changed in the transition region which we say is the region between the light entrance area and the output

461

region. The transition region has the optical elements and the output region has got the deformities.

Q. Let me try to ask you this outside of the context of the claim language. Because that may be easier for me.

Those lines that we are looking at in the green section of this photograph, are they the same physically as the lines that we're looking at in the regions you've marked in blue?

A. They appear to be similar.

Q. Okay. You didn't take any measurements to see if they are somehow different, have you?

A. No, I did not.

Q. To your trained eye, they look to be just the same line extending from the green region to the blue legion, correct?

MR. KENNEDY: Objection. Form.

THE WITNESS: This is -- this is true. Although the transition region has what we call the optical elements that are used for mixing the light in the LED's, and in the output region they perform a different function. I mean their optical deformities help with the light distribution coming off from the panel member.

32 (Pages 458 to 461)

WILLIAM BOHANNON - RESTRICTED - ATTORNEYS' EYES ONLY

462

BY MR. LO:

Q. I'll get to the function of it in a minute. I'm going to ask you some questions about that.

A. Okay.

Q. My preliminary question is, physically those lines that we are looking at in the transition region and also in what you've marked in blue as the output region, they are physically the same, correct?

A. Well, they are in a different spot.

Q. Yes. But they -- but the physical formation of those lines are the same, correct?

A. They appear to be similar.

Q. They appear to be similar or the same?

A. They appear to be similar.

Q. Okay.

A. I didn't -- I haven't measured them. I can go back and measure them, I suppose, and determine if they are, in fact, similar or not. But I am willing to admit that they appear similar. They perform a different function and they have a different nomenclature depending upon the area.

Q. Okay. In the portion that you've marked

463

as the output region, what do the stripes do?

A. So, and we had discussed earlier about your prismatic film structure and how that's similar to like a Fresnel lens, like a cylindrical lens.

So, in my opinion, those -- those linear deformities in the output region are used to control the -- the output ray angle.

Q. Okay.

A. The light coming out of the output area.

Q. Do those stripes in the output region have the effect of redirecting the light towards the viewer?

A. That's what I think.

Q. Okay. Would you -- is that what you would refer to as something that -- is that feature which you -- in the output region what you refer to as something that is light extracting?

A. Yes.

Q. Okay. The stripes that are then in the transition region, do they also sometimes direct light out towards the viewer?

A. So -- so those optical elements on that side are used for -- they're optical elements used for refracting and reflecting light and mixing light from the LED's.

464

Q. So I understand your point that there may be a different intent in putting them there.

What I'm asking you about is from a scientific perspective, do they also function to send light out of the panel towards the viewer?

A. In -- in reality that area is covered, and the output region is the only area that's exposed to the LED. So -- so the parts of the tray or housing are actually covering it.

So it actually performs no function in terms of putting it out to the viewer, because -- because the light is incapable of going out to the viewer from that transition region.

Q. Okay. So your view is that in the transition region, there is something physically blocking the light from reaching the viewer, correct?

A. Yes.

Q. Okay. And -- but what is happening behind the thing that is blocking it is that some light because of these stripes are being directed in the direction of the viewer, correct?

A. That's --

Q. They're not getting there?

A. I have -- I have some pictures of it. I

465

think -- I don't know if the pictures are in here. Let me look and see. But I took some nice pictures of that.

Maybe it's in the LG report of a double-sided light mixing area. I have some nice close-ups of that mixing.

I'm not -- I'm not finding it here, but I know I have it in the LG report. I could take similar pictures for the Vizio panel member with deformities on both sides of the mixing.

Do you want me to show you the picture from the LG side?

Q. No. No. I'm trying to stay away from that if possible.

A. Okay. But I have a -- I have a picture of that that shows this area illuminated operating, where the LED's are operating, and you can clearly see that the light is being mixed, the light between these two LED's is being mixed in this transition area (indicating).

Q. Well, here's my question.

If you were -- if you took the panel out of the tray and you sent light through it, the stripes on the -- in the -- what you have marked as the transition region, do they have the effect of

33 (Pages 462 to 465)

WILLIAM BOHANNON - RESTRICTED - ATTORNEYS' EYES ONLY

485

That the foregoing pages contain a full, true and accurate record of the proceedings and testimony to the best of my skill and ability;

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have subscribed my name this 7th day of August, 2016.

PATRICIA L. HUBBARD, CSR #3400

# EXHIBIT F

US007537370B2

## (12) United States Patent

Parker

(10) Patent No.: **US 7,537,370 B2**

(45) Date of Patent: *May 26, 2009

(54) **LIGHT EMITTING PANEL ASSEMBLIES**

(75) Inventor: **Jeffery R. Parker**, Richfield, OH (US)

(73) Assignee: **Solid State Opto Limited** (VG)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/548,330**

(22) Filed: **Oct. 11, 2006**

(65) **Prior Publication Data**

US 2007/0153549 A1      Jul. 5, 2007

**Related U.S. Application Data**

(60) Division of application No. 10/784,527, filed on Feb. 23, 2004, now Pat. No. 7,160,015, which is a division of application No. 09/256,275, filed on Feb. 23, 1999, now Pat. No. 6,712,481, which is a continuation-in-part of application No. 08/778,089, filed on Jan. 2, 1997, now Pat. No. 6,079,838, which is a division of application No. 08/495,176, filed on Jun. 27, 1995, now Pat. No. 5,613,751.

(51) **Int. Cl.**
*F21V 8/00* (2006.01)

(52) **U.S. Cl.** ........................ **362/607**; 362/618; 362/619; 362/620

(58) **Field of Classification Search** ................. 362/603, 362/606–609, 617–621, 623–628
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,480,178 | A | 8/1949 | Zinberg |
| 3,043,947 | A | 7/1962 | Albinger, Jr. |
| 3,241,256 | A | 3/1966 | Viret et al. |
| 3,328,570 | A | 6/1967 | Balchunas |
| 3,721,815 | A | 3/1973 | Wall |
| 3,752,974 | A | 8/1973 | Baker et al. |
| 3,760,179 | A | 9/1973 | Addington, Jr. |
| 3,781,537 | A | 12/1973 | Ramsey |
| 3,892,959 | A | 7/1975 | Pulles |
| 3,958,113 | A | 5/1976 | Termohlen |
| 4,043,636 | A | 8/1977 | Eberhardt et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 61-240506 | 10/1986 |

(Continued)

*Primary Examiner*—Thomas M Sember
(74) *Attorney, Agent, or Firm*—Renner, Otto, Boisselle & Sklar, LLP

(57) **ABSTRACT**

Light emitting panel assemblies include an optical panel member having a pattern of light extracting deformities on or in one or both sides to cause light to be emitted in a predetermined output distribution. The pattern of light extracting deformities on or in one side may have two or more different types or shapes of deformities and at least one of the types or shapes may vary along the length or width of the panel member. Where the light extracting deformities are on or in both sides, at least some of the deformities on or in one side may be of a different type or shape or vary in a different way or manner than the deformities on or in the other side.

**48 Claims, 4 Drawing Sheets**





DDG-001841

**US 7,537,370 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,128,332 | A | 12/1978 | Rowe |
| 4,257,084 | A | 3/1981 | Reynolds |
| 4,277,817 | A | 7/1981 | Hehr |
| 4,323,951 | A | 4/1982 | Pasco |
| 4,373,282 | A | 2/1983 | Wragg |
| 4,446,508 | A | 5/1984 | Kinzie |
| 4,519,017 | A | 5/1985 | Daniel |
| 4,573,766 | A | 3/1986 | Bournay, Jr. et al. |
| 4,630,895 | A | 12/1986 | Abdala, Jr. et al. |
| 4,648,690 | A | 3/1987 | Ohe |
| 4,673,254 | A | 6/1987 | Kato et al. |
| 4,677,531 | A | 6/1987 | Szeles |
| 4,714,983 | A | 12/1987 | Lang |
| 4,729,067 | A | 3/1988 | Ohe |
| 4,729,068 | A | 3/1988 | Ohe |
| 4,729,185 | A | 3/1988 | Baba |
| 4,751,615 | A | 6/1988 | Abrams |
| 4,761,047 | A | 8/1988 | Mori |
| 4,763,984 | A | 8/1988 | Awai et al. |
| 4,765,701 | A | 8/1988 | Cheslak |
| 4,791,540 | A | 12/1988 | Dreyer, Jr. et al. |
| 4,802,066 | A | 1/1989 | Mori |
| 4,811,507 | A | 3/1989 | Blanchet |
| 4,825,341 | A | 4/1989 | Awai |
| 4,890,201 | A | 12/1989 | Joft |
| 4,909,604 | A | 3/1990 | Kobayashi et al. |
| 4,914,553 | A | 4/1990 | Hamada et al. |
| 4,929,062 | A | 5/1990 | Guzik et al. |
| 4,974,122 | A | 11/1990 | Shaw |
| 4,975,808 | A | 12/1990 | Bond et al. |
| 4,978,952 | A | 12/1990 | Irwin |
| 4,985,809 | A | 1/1991 | Matsui et al. |
| 5,005,108 | A | 4/1991 | Pristash et al. |
| 5,027,258 | A | 6/1991 | Schoniger et al. |
| 5,055,978 | A | 10/1991 | Rogoff |
| 5,070,431 | A | 12/1991 | Kitazawa et al. |
| 5,093,765 | A | 3/1992 | Kashima et al. |
| 5,134,549 | A | 7/1992 | Yokoyama |
| 5,136,480 | A | 8/1992 | Pristash et al. |
| 5,136,483 | A | 8/1992 | Schoniger et al. |
| 5,190,370 | A | 3/1993 | Miller et al. |
| 5,207,493 | A | 5/1993 | Murase et al. |
| 5,243,506 | A | 9/1993 | Whitehead |
| 5,262,928 | A | 11/1993 | Kashima et al. |
| 5,283,673 | A | 2/1994 | Murase et al. |
| 5,339,179 | A | 8/1994 | Rudisill et al. |
| 5,349,503 | A | 9/1994 | Blonder et al. |
| 5,375,043 | A | 12/1994 | Tokunaga |
| 5,377,084 | A | 12/1994 | Kojima et al. |
| 5,390,085 | A | 2/1995 | Mari-Roca et al. |
| 5,390,436 | A | 2/1995 | Ashall |
| 5,394,308 | A | 2/1995 | Watanabe et al. |
| 5,467,208 | A | 11/1995 | Kokawa et al. |
| 5,467,417 | A | 11/1995 | Nakamura et al. |
| 5,477,423 | A | 12/1995 | Fredriksz et al. |
| 5,479,275 | A | 12/1995 | Abileah |
| 5,485,291 | A | 1/1996 | Qiao et al. |
| 5,600,455 | A | 2/1997 | Ishikawa et al. |
| 5,613,751 | A | 3/1997 | Parker et al. |
| 5,719,649 | A | 2/1998 | Shono et al. |
| 5,775,791 | A | 7/1998 | Yoshikawa et al. |
| 5,947,578 | A | 9/1999 | Ayres |
| 5,999,685 | A | 12/1999 | Goto et al. |
| 6,827,456 | B2 | 12/2004 | Parker et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 06-003526 | 1/1994 |
| JP | 07-120605 | 5/1995 |
| JP | 07-159607 | 6/1995 |
| JP | 6-25802 | 4/1998 |

DDG-001842



FIG. 1

FIG. 2

FIG.4d

FIG. 4a

FIG. 4b

FIG.4c

FIG. 3

DDG-001843



FIG. 5

FIG. 6

FIG. 7

FIG. 8

DDG-001844



FIG. 9

FIG. 10

FIG. 11

FIG. 11a

FIG. 12

DDG-001845

Case 1:13-cv-02112-RGA    Document 294-12    Filed 09/01/16    Page 16 of 109 PageID #: 14994



FIG. 13



FIG. 14



FIG. 15

DDG-001846

US 7,537,370 B2

**1**

## LIGHT EMITTING PANEL ASSEMBLIES

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a division of U.S. patent application Ser. No. 10/784,527, filed Feb. 23, 2004, which is a division of U.S. patent application Ser. No. 09/256,275, filed Feb. 23, 1999, now U.S. Pat. No. 6,712,481, dated Mar. 30, 2004, which is a continuation-in-part of U.S. patent application Ser. No. 08/778,089, filed Jan. 2, 1997, now U.S. Pat. No. 6,079, 838, dated Jun. 27, 2000, which is a division of U.S. patent application Ser. No. 08/495,176, filed Jun. 27, 1995, now U.S. Pat. No. 5,613,751, dated Mar. 25, 1997.

### BACKGROUND OF THE INVENTION

This invention relates generally, as indicated, to light emitting panel assemblies each including a transparent panel member for efficiently conducting light, and controlling the light conducted by the panel member to be emitted from one or more light output areas along the length thereof.

Light emitting panel assemblies are generally known. However, the present invention relates to several different light emitting panel assembly configurations which provide for better control of the light output from the panel assemblies and for more efficient utilization of light, which results in greater light output from the panel assemblies.

### SUMMARY OF THE INVENTION

In accordance with one aspect of the invention, the light emitting panel assemblies include a light emitting panel member having a light transition area in which at least one light source is suitably mounted for transmission of light to the light input surface of the panel member.

In accordance with another aspect of the invention, the light source is desirably embedded, potted or bonded to the light transition area to eliminate any air gaps, decrease surface reflections and/or eliminate any lens effect between the light source and light transition area, thereby reducing light loss and increasing the light output from the panel assembly.

In accordance with another aspect of the invention, the panel assemblies may include reflective or refractive surfaces for changing the path of a portion of the light, emitted from the light source, that would not normally enter the panel members at an acceptable angle that allows the light to remain in the panel members for a longer period of time and/or increase the efficiency of the panel members.

In accordance with another aspect of the invention, the light emitting panel members include a pattern of light extracting deformities or disruptions which provide a desired light output distribution from the panel members by changing the angle of refraction of a portion of the light from one or more light output areas of the panel members.

In accordance with still another aspect of the invention, the light source may include multiple colored light sources for supplying light to one or more light output areas, and for providing a colored or white light output distribution.

In accordance with yet another aspect of the invention, the panel assemblies include a transition area for mixing the multiple colored lights, prior to the light entering the panel members, in order to effect a desired colored or white light output distribution.

The various light emitting panel assemblies of the present invention are very efficient panel assemblies that may be used to produce increased uniformity and higher light output from

**2**

the panel members with lower power requirements, and allow the panel members to be made thinner and/or longer, and/or of various shapes and sizes.

To the accomplishment of the foregoing and related ends, the invention then comprises the features hereinafter fully described and particularly pointed out in the claims, the following description and the annexed drawings setting forth in detail certain illustrative embodiments of the invention, these being indicative, however, of but several of the various ways in which the principles of the invention may be employed.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the annexed drawings:

FIGS. **1** through **3** are schematic perspective views of three different forms of light emitting panel assemblies in accordance with this invention;

FIG. **4a** is an enlarged plan view of a portion of a light output area of a panel assembly showing one form of pattern of light extracting deformities on the light output area;

FIGS. **4b**, **c** and **d** are enlarged schematic perspective views of a portion of a light output area of a panel assembly showing other forms of light extracting deformities formed in or on the light output area;

FIG. **5** is an enlarged transverse section through the light emitting panel assembly of FIG. **3** taken generally on the plane of the line **5-5** thereof;

FIG. **6** is a schematic perspective view of another form of light emitting panel assembly in accordance with this invention;

FIG. **7** is a schematic top plan view of another form of light emitting panel assembly in accordance with this invention;

FIG. **8** is a schematic perspective view of another form of light emitting panel assembly in accordance with this invention;

FIG. **9** is a schematic top plan view of another form of light emitting panel assembly in accordance with this invention;

FIG. **10** is a schematic top plan view of still another form of light emitting panel assembly in accordance with this invention;

FIG. **11** is a side elevation view of the light emitting panel assembly of FIG. **10**;

FIG. **11a** is a fragmentary side elevation view showing a tapered or rounded end on the panel member in place of the prismatic surface shown in FIGS. **10** and **11**;

FIG. **12** is a schematic top plan view of another form of light emitting panel assembly in accordance with this invention;

FIG. **13** is a schematic side elevation view of the light emitting panel assembly of FIG. **12**; and

FIGS. **14** and **15** are schematic perspective views of still other forms of light emitting panel assemblies in accordance with this invention.

### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now in detail to the drawings, and initially to FIG. **1**, there is schematically shown one form of light emitting panel assembly **1** in accordance with this invention including a transparent light emitting panel **2** and one or more light sources **3** which emit light in a predetermined pattern in a light transition member or area **4** used to make the transition from the light source **3** to the light emitting panel **2**, as well known in the art. The light that is transmitted by the light transition area **4** to the transparent light emitting panel **2** may be emitted along the entire length of the panel or from one or

DDG-001847

US 7,537,370 B2

3

more light output areas along the length of the panel as desired to produce a desired light output distribution to fit a particular application.

In FIG. 1 the light transition area 4 is shown as an integral extension of one end of the light emitting panel 2 and as being generally rectangular in shape. However, the light transition area may be of other shapes suitable for embedding, potting, bonding or otherwise mounting the light source. Also, reflective or refractive surfaces may be provided to increase efficiency. Moreover, the light transition area 4 may be a separate piece suitably attached to the light input surface 13 of the panel member if desired. Also, the sides of the light transition area may be curved to more efficiently reflect or refract a portion of the light emitted from the light source through the light emitting panel at an acceptable angle.

FIG. 2 shows another form of light emitting panel assembly 5 in accordance with this invention including a panel light transition area 6 at one end of the light emitting panel 7 with sides 8, 9 around and behind the light source 3 shaped to more efficiently reflect and/or refract and focus the light emitted from the light source 3 that impinges on these surfaces back through the light transition area 6 at an acceptable angle for entering the light input surface 18 at one end of the light emitting panel 7. Also, a suitable reflective material or coating 10 may be provided on the portions of the sides of the light transition areas of the panel assemblies of FIGS. 1 and 2 on which a portion of the light impinges for maximizing the amount of light or otherwise changing the light that is reflected back through the light transition areas and into the light emitting panels.

The panel assemblies shown in FIGS. 1 and 2 include a single light source 3, whereas FIG. 3 shows another light emitting panel assembly 11 in accordance with this invention including two light sources 3. Of course, it will be appreciated that the panel assemblies of the present invention may be provided with any number of light sources as desired, depending on the particular application.

The panel assembly 11 of FIG. 3 includes a light transition area 12 at one end of the light emitting panel 14 having reflective and/or refractive surfaces 15 around and behind each light source 3. These surfaces 15 may be appropriately shaped including for example curved, straight and/or faceted surfaces, and if desired, suitable reflective materials or coatings may be provided on portions of these surfaces to more efficiently reflect and/or refract and focus a portion of the light emitted for example from an incandescent light source which emits light in a 360° pattern through the light transition areas 12 into the light input surface 19 of the light emitting panel 14.

The light sources 3 may be mechanically held in any suitable manner in slots, cavities or openings 16 machined, molded or otherwise formed in the light transition areas of the panel assemblies. However, preferably the light sources 3 are embedded, potted or bonded in the light transition areas in order to eliminate any air gaps or air interface surfaces between the light sources and surrounding light transition areas, thereby reducing light loss and increasing the light output emitted by the light emitting panels. Such mounting of the light sources may be accomplished, for example, by bonding the light sources 3 in the slots, cavities or openings 16 in the light transition areas using a sufficient quantity of a suitable embedding, potting or bonding material 17. The slots, cavities or openings 16 may be on the top, bottom, sides or back of the light transition areas. Bonding can also be accomplished by a variety of methods that do not incorporate extra material, for example, thermal bonding, heat staking, ultra-

4

sonic or plastic welding or the like. Other methods of bonding include insert molding and casting around the light source(s).

A transparent light emitting material of any suitable type, for example acrylic or polycarbonate, may be used for the light emitting panels. Also, the panels may be substantially flat, or curved, may be a single layer or multi-layers, and may have different thicknesses and shapes. Moreover, the panels may be flexible, or rigid, and may be made out of a variety of compounds. Further, the panels may be hollow, filled with liquid, air, or be solid, and may have holes or ridges in the panels.

Each light source 3 may also be of any suitable type including, for example, any of the types disclosed in U.S. Pat. Nos. 4,897,771 and 5,005,108, assigned to the same assignee as the present application, the entire disclosures of which are incorporated herein by reference. In particular, the light sources 3 may be an arc lamp, an incandescent bulb which also may be colored, filtered or painted, a lens end bulb, a line light, a halogen lamp, a light emitting diode (LED), a chip from an LED, a neon bulb, a fluorescent tube, a fiber optic light pipe transmitting from a remote source, a laser or laser diode, or any other suitable light source. Additionally, the light sources 3 may be a multiple colored LED, or a combination of multiple colored radiation sources in order to provide a desired colored or white light output distribution. For example, a plurality of colored lights such as LEDs of different colors (red, blue, green) or a single LED with multiple colored chips may be employed to create white light or any other colored light output distribution by varying the intensities of each individual colored light.

A pattern of light extracting deformities or disruptions may be provided on one or both sides of the panel members or on one or more selected areas on one or both sides of the panel members, as desired. FIG. 4a schematically shows one such light surface area 20 on which a pattern of light extracting deformities or disruptions 21 is provided. As used herein, the term deformities or disruptions are used interchangeably to mean any change in the shape or geometry of the panel surface and/or coating or surface treatment that causes a portion of the light to be emitted. The pattern of light extracting deformities 21 shown in FIG. 4a includes a variable pattern which breaks up the light rays such that the internal angle of reflection of a portion of the light rays will be great enough to cause the light rays either to be emitted out of the panel through the side or sides on which the light extracting deformities 21 are provided or reflected back through the panel and emitted out the other side.

These deformities or disruptions 21 can be produced in a variety of manners, for example, by providing a painted pattern, an etched pattern, a machined pattern, a printed pattern, a hot stamped pattern, or a molded pattern or the like on selected light output areas of the panel members. An ink or printed pattern may be applied for example by pad printing, silk screening, ink jet, heat transfer film process or the like. The deformities may also be printed on a sheet or film which is used to apply the deformities to the panel member. This sheet or film may become a permanent part of the light panel assembly for example by attaching or otherwise positioning the sheet or film against one or both sides of the panel member similar to the sheet or film 27 shown in FIGS. 3 and 5 in order to produce a desired effect.

By varying the density, opaqueness or translucence, shape, depth, color, area, index of refraction, or type of deformities 21 on an area or areas of the panels, the light output of the panels can be controlled. The deformities or disruptions may be used to control the percent of light emitted from any area of the panels. For example, less and/or smaller size deformi-

DDG-001848

US 7,537,370 B2

ties **21** may be placed on panel areas where less light output is wanted. Conversely, a greater percentage of and/or larger deformities may be placed on areas of the panels where greater light output is desired.

Varying the percentages and/or size of deformities in different areas of the panel is necessary in order to provide a uniform light output distribution. For example, the amount of light traveling through the panels will ordinarily be greater in areas closer to the light source than in other areas further removed from the light source. A pattern of light extracting deformities **21** may be used to adjust for the light variances within the panel members, for example, by providing a denser concentration of light extracting deformities with increased distance from the light source **3** thereby resulting in a more uniform light output distribution from the light emitting panels.

The deformities **21** may also be used to control the output ray angle distribution of the emitted light to suit a particular application. For example, if the panel assemblies are used to provide a liquid crystal display backlight, the light output will be more efficient if the deformities **21** cause the light rays to emit from the panels at predetermined ray angles such that they will pass through the liquid crystal display with low loss.

Additionally, the pattern of light extracting deformities may be used to adjust for light output variances attributed to light extractions of the panel members. The pattern of light extracting deformities **21** may be printed on the light output areas utilizing a wide spectrum of paints, inks, coatings, epoxies, or the like, ranging from glossy to opaque or both, and may employ half-tone separation techniques to vary the deformity **21** coverage. Moreover, the pattern of light extracting deformities **21** may be multiple layers or vary in index of refraction.

Print patterns of light extracting deformities **21** may vary in shapes such as dots, squares, diamonds, ellipses, stars, random shapes, and the like, and are desirably 0.006 square inch per deformity/element or less. Also, print patterns that are 60 lines per inch or finer are desirably employed, thus making the deformities or shapes **21** in the print patterns nearly invisible to the human eye in a particular application thereby eliminating the detection of gradient or banding lines that are common to light extracting patterns utilizing larger elements. Additionally, the deformities may vary in shape and/or size along the length and/or width of the panel members. Also, a random placement pattern of the deformities may be utilized throughout the length and/or width of the panel members. The deformities may have shapes or a pattern with no specific angles to reduce moiré or other interference effects. Examples of methods to create these random patterns are printing a pattern of shapes using stochastic print pattern techniques, frequency modulated half tone patterns, or random dot half tones. Moreover, the deformities may be colored in order to effect color correction in the panel members. The color of the deformities may also vary throughout the panel members, for example to provide different colors for the same or different light output areas.

In addition to or in lieu of the patterns of light extracting deformities **21** shown in FIG. **4**a, other light extracting deformities including prismatic surfaces, depressions or raised surfaces of various shapes using more complex shapes in a mold pattern may be molded, etched, stamped, thermoformed, hot stamped or the like into or on one or more areas of the panel member. FIGS. **4**b and **4**c show panel areas **22** on which prismatic surfaces **23** or depressions **24** are formed in the panel areas, whereas FIG. **4**d shows prismatic or other reflective or refractive surfaces **25** formed on the exterior of the panel area. The prismatic surfaces, depressions or raised surfaces will cause a portion of the light rays contacted thereby to be emitted from the panel member. Also, the angles of the prisms, depressions or other surfaces may be varied to direct the light in different directions to produce a desired light output distribution or effect. Moreover, the reflective or refractive surfaces may have shapes or a pattern with no specific angles to reduce moire or other interference effects.

As best seen in the cross sectional view of FIG. **5**, a back reflector (including trans reflectors) **26** may be attached or positioned against one side of the panel member **14** of FIG. **3** using a suitable adhesive **28** or other method in order to improve light output efficiency of the panel assembly **11** by reflecting the light emitted from that side back through the panel for emission through the opposite side. Additionally, a pattern of light extracting deformities **21**, **23**, **24** and/or **25** may be provided on one or both sides of the panel member in order to change the path of the light so that the internal critical angle is exceeded and a portion of the light is emitted from one or both sides of the panel. Moreover, a transparent film, sheet or plate **27** may be attached or positioned against the side or sides of the panel member from which light is emitted using a suitable adhesive **28** or other method in order to produce a desired effect.

The member **27** may be used to further improve the uniformity of the light output distribution. For example, the member **27** may be a colored film, a diffuser, or a label or display, a portion of which may be a transparent overlay that may be colored and/or have text or an image thereon.

If adhesive **28** is used to adhere the back reflector **26** and/or film **27** to the panel, the adhesive is preferably applied only along the side edges of the panel, and if desired the end edge opposite the light transition areas **12**, but not over the entire surface area or areas of the panel because of the difficulty in consistently applying a uniform coating of adhesive to the panel. Also, the adhesive changes the internal critical angle of the light in a less controllable manner than the air gaps **30** (see FIG. **5**) which are formed between the respective panel surfaces and the back reflector **26** and/or film **27** when only adhered along the peripheral edges. Additionally, longer panel members are achievable when air gaps **30** are used. If adhesive were to be used over the entire surface, the pattern of deformities could be adjusted to account for the additional attenuation in the light caused by the adhesive.

Referring further to FIG. **2**, the panel assembly **5** shown therein also includes molded posts **31** at one or more corners of the panel **7** (four such posts being shown) which may be used to facilitate mounting of the panel assembly and providing structural support for other parts or components, for example, a display panel such as a liquid crystal display panel as desired.

FIG. **6** shows another form of light emitting panel assembly **32** in accordance with this invention including a panel member **33**, one or more light sources **3**, and one or more light output areas **34**. In addition, the panel assembly **32** includes a tray **35** having a cavity or recess **36** in which the panel assembly **32** is received. The tray **35** may act as a back reflector as well as end edge and/or side edge reflectors for the panel **33** and side and/or back reflectors **37** for the light sources **3**. Additionally, one or more secondary reflective or refractive surfaces **38** may be provided on the panel member **33** and/or tray **35** to reflect a portion of the light around one or more corners or curves in a non-rectangular shaped panel member **33**. These secondary reflective/refractive surfaces **38** may be flat, angled, faceted or curved, and may be used to extract a portion of the light away from the panel member in a prede-

DDG-001849

US 7,537,370 B2

7

termined pattern. FIG. **6** also shows multiple light output areas **34** on the panel member that emit light from one or more light sources **3**.

FIG. **7** is a schematic illustration of still another form of light emitting panel assembly **40** in accordance with this invention including a panel member **41** having one or more light output areas **42** and one or more light transition areas (mixing areas) **43** containing a plurality of light sources **3** at one or both ends of the panel. Each transition area mixes the light from one or more light sources having different colors and/or intensities. In this particular embodiment, each of the light sources **3** desirably employs three colored LEDs (red, blue, green) in each transition mixing area **43** so that the light from the three LEDs can be mixed to produce a desired light output color that will be emitted from the light output area **42**. Alternatively, each light source may be a single LED having multiple colored chips bonded to the lead film. Also, two colored LEDs or a single LED having two colored chips may be used for a particular application. By varying the intensities of the individual respective LEDs, virtually any colored light output or white light distribution can be achieved.

FIG. **8** shows yet another form of light emitting panel assembly **45** in accordance with this invention including a light emitting panel member **46** and a light source **3** in a light transition area **48** integral with one end of the panel member. In this particular embodiment, the panel member **46** is three-dimensionally curved, for example, such that light rays may be emitted in a manner that facilitates aesthetic design of a lighted display.

FIG. **9** schematically shows another form of light emitting panel assembly **50** in accordance with this invention, including a panel member **51** having multiple light output areas **52**, and mounting posts and/or mounting tabs **53**. This particular panel assembly **50** may serve as a structural member to support other parts or components as by providing holes or cavities **54**, **55** in the panel member **51** which allow for the insertion of modular components or other parts into the panel member. Moreover, a separate cavity or recess **56** may be provided in the panel member **51** for receipt of a correspondingly shaped light transition area **57** having one or more light sources **3** embedded, bonded, cast, insert molded, epoxied, or otherwise mounted or positioned therein and a curved reflective or refractive surface **58** on the transition area **57** and/or wall of the cavity or recess **56** to redirect a portion of the light in a predetermined manner. In this way the light transition area **57** and/or panel member may be in the form of a separate insert which facilitates the easy placement of the light source in a modular manner. A reflector **58** may be placed on the reflective or refractive surface of the cavity or recess **56** or insert **57**. Where the reflector **58** is placed on the reflective or refractive surface of the cavity or recess **56**, the cavity or recess may act as a mold permitting transparent material from which the transition area **57** is made to be cast around one or more light sources **3**.

FIGS. **10** and **11** schematically show another form of light emitting panel assembly **60** in accordance with this invention including a panel member **61** having one or more light output areas **62**. In this particular embodiment, an off-axis light transition area **63** is provided that is thicker in cross section than the panel member to permit use of one or more light sources **3** embedded or otherwise mounted in the light transition area that are dimensionally thicker than the panel member. Also, a three-dimensional reflective surface **64** (FIG. **11**) may be provided on the transition area **63**. Moreover, a prism **65** (FIG. **11**) or tapered, rounded, or otherwise shaped end **66** (FIG. **11***a*) may be provided at the end of the panel opposite the light sources **3** to perform the function of an end reflector.

8

The light sources **3** may be oriented at different angles relative to each other and offset to facilitate better mixing of the light rays **67** in the transition area **63** as schematically shown in FIG. **10** and/or to permit a shorter length transition area **63** to be used.

FIGS. **12** and **13** schematically show still another form of light emitting panel assembly **70** in accordance with this invention which includes one or more light transition areas **71** at one or both ends of the panel member **72** each containing a single light source **73**. The transition area or areas **71** shown in FIGS. **12** and **13** collect light with multiple or three-dimensional surfaces and/or collect light in more than one plane. For example each transition area **71** shown in FIGS. **12** and **13** has elliptical and parabolic shape surfaces **74** and **75** in different planes for directing the light rays **76** into the panel member at a desired angle.

Providing one or more transition areas at one or both ends of the panel member of any desired dimension to accommodate one or more light sources, with reflective and/or refractive surfaces on the transition areas for redirecting the light rays into the panel member at relatively low angles allows the light emitting panel member to be made much longer and thinner than would otherwise be possible. For example the panel members of the present invention may be made very thin, i.e., 0.125 inch thick or less.

FIG. **14** schematically illustrates still another form of light emitting panel assembly **80** in accordance with this invention including a light emitting panel **81** and one or more light sources **3** positioned, embedded, potted, bonded or otherwise mounted in a light transition area **82** that is at an angle relative to the panel member **81** to permit more efficient use of space. An angled or curved reflective or refractive surface **83** is provided at the junction of the panel member **81** with the transition area **82** in order to reflect/refract light from the light source **3** into the body of the panel member **81** for emission of light from one or more light emitting areas **84** along the length of the panel member.

FIG. **15** schematically illustrates still another form of light emitting panel assembly **90** in accordance with this invention including a light transition area **91** at one or both ends of a light emitting panel member **92** containing a slot **93** for sliding receipt of an LED or other suitable light source **3**. Preferably the slot **93** extends into the transition area **91** from the back edge **94**, whereby the light source **3** may be slid and/or snapped in place in the slot from the back, thus allowing the transition area to be made shorter and/or thinner. The light source **3** may be provided with wings, tabs or other surfaces **95** for engagement in correspondingly shaped recesses or grooves **96** or the like in the transition area **91** for locating and, if desired, securing the light source in place. Also, the light source **3** may be embedded, potted, bonded or otherwise secured within the slot **93** in the light transition area **91** of the panel member **92**. Light from a secondary light source **97** may be projected through the panel member **92** for indication or some other effect.

The various light emitting panel assemblies disclosed herein may be used for a great many different applications including for example LCD back lighting or lighting in general, decorative and display lighting, automotive lighting, dental lighting, phototherapy or other medical lighting, membrane switch lighting, and sporting goods and apparel lighting or the like. Also the panel assemblies may be made such that the panel members and deformities are transparent without a back reflector. This allows the panel assemblies to be used for example to front light an LCD or other display such that the display is viewed through the transparent panel members.

DDG-001850

US 7,537,370 B2

9

Although the invention has been shown and described with respect to certain preferred embodiments, it is obvious that equivalent alterations and modifications will occur to others skilled in the art upon the reading and understanding of the specification. The present invention includes all such equivalent alterations and modifications, and is limited only by the scope of the claims.

What is claimed is:

1. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member, and at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss.

2. The assembly of claim 1 wherein the deformities on or in one of the sides are prismatic.

3. The assembly of claim 1 wherein the deformities on or in one of the sides are lenticular.

4. The assembly of claim 1 wherein the deformities on or in one of the sides run the full length or width of the one side.

5. The assembly of claim 1 wherein the deformities on or in one of the sides are quite small in relation to the length and width of the panel member.

6. The assembly of claim 1 wherein the deformities on or in one of the sides have at least one diffuse surface.

7. The assembly of claim 1 wherein the deformities on or in one of the sides are etched dots.

8. The assembly of claim 1 wherein the deformities on or in one of the sides vary randomly.

9. The assembly of claim 1 wherein the panel member is flat.

10. The assembly of claim 1 wherein the panel member is tapered.

11. The assembly of claim 1 wherein the deformities on or in one of the sides vary in at least one of the following characteristics: slope angle, density, orientation, height or depth, and size.

12. The assembly of claim 1 wherein at least one side of the sheet, film or substrate has deformities or optical elements.

13. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member, wherein the panel member has a transition region between the at least one input edge and the patterns of light extracting

10

deformities to allow the light from the at least one light source to mix and spread, and at least one side of the transition region contains optical elements for reflecting or refracting light from the at least one light source.

14. The assembly of claim 13 wherein the optical elements are faceted.

15. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, at least one of the sides having a pattern of light extracting deformities that are projections or depressions on or in the at least one side to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in the at least one side has at least two different types of light extracting deformities and at least one of the types of deformities on or in the at least one side varies along at least one of the length and width of the panel member, and at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss.

16. The assembly of claim 15 wherein at least one of the types of deformities is prismatic.

17. The assembly of claim 15 wherein at least one of the types of deformities is lenticular.

18. The assembly of claim 15 wherein the deformities on or in the one side run the full length or width of the one side.

19. The assembly of claim 15 wherein at least one of the types of deformities is quite small in relation to the length and width of the panel member.

20. The assembly of claim 15 wherein at least one of the types of deformities has at least one diffuse surface.

21. The assembly of claim 15 wherein at least one of the types of deformities is etched dots.

22. The assembly of claim 15 wherein at least one of the types of deformities varies randomly.

23. The assembly of claim 15 wherein the panel member is flat.

24. The assembly of claim 15 wherein the panel member is tapered.

25. The assembly of claim 15 wherein at least one of the types of deformities varies in at least one of the following characteristics: slope angle, density, orientation, height or depth, and size.

26. The assembly of claim 15 wherein at least one side of the film, sheet or substrate has deformities or optical elements.

27. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, at least one of the sides having a pattern of light extracting deformities that are projections or depressions on or in the at least one side to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in the at least one side has at least two different types of light extracting deformities and at least one of the types of deformities on or in the at least one side varies alone at least one of the length and width of the panel member, wherein the panel member has a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread, and at least one side of the

DDG-001851

US 7,537,370 B2

**11**

transition region contains optical elements for reflecting or refracting light from the at least one light source.

28. The assembly of claim **27** wherein the optical elements are faceted.

29. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides vary in a different way or manner than the light extracting deformities on or in the other side of the panel member, and at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss.

30. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary in density.

31. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary in slope angle relative to one another.

32. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary in position.

33. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary in angle of orientation relative to one another.

34. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary in height or depth.

35. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary in size.

36. The assembly of claim **29** wherein at least some of the deformities on or in at least one side do not vary.

37. The assembly of claim **29** wherein at least some of the deformities on or in at least one side vary randomly.

38. The assembly of claim **29** wherein at least some of the deformities are prismatic.

**12**

39. The assembly of claim **29** wherein at least some of the deformities are lenticular.

40. The assembly of claim **29** wherein the deformities on or in one of the sides run the full length or width of the one side.

41. The assembly of claim **29** wherein at least some of the deformities are quite small in relation to the length and width of the panel member.

42. The assembly of claim **29** wherein at least some of the deformities have at least one diffuse surface.

43. The assembly of claim **29** wherein at least some of the deformities are etched dots.

44. The assembly of claim **29** wherein the panel member is flat.

45. The assembly of claim **29** wherein the panel member is tapered.

46. The assembly of claim **29** wherein at least one side of the sheet, film or substrate has deformities or optical elements.

47. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides vary in a different way or manner than the light extracting deformities on or in the other side of the panel member, wherein the panel member has a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread, and at least one side of the transition region contains optical elements for reflecting or refracting light from the at least one light source.

48. The assembly of claim **47** wherein the optical elements are faceted.

\*   \*   \*   \*   \*

DDG-001852

# EXHIBIT G

**'370 Patent Claim Comparison**

| | | | |
|---|---|---|---|
| 1. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member, and at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss. | 13. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member, wherein the panel member has a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread, and at least one side of the transition region contains optical elements for reflecting or refracting light from the at least one light source. | 29. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides vary in a different way or manner than the light extracting deformities on or in the other side of the panel member, and at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss. | 47. A light emitting panel assembly comprising at least one light source, an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness, both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution, where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and at least some of the light extracting deformities on or in one of the sides vary in a different way or manner than the light extracting deformities on or in the other side of the panel member, wherein the panel member has a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread, and at least one side of the transition region contains optical elements for reflecting or refracting light from the at least one light source. |

Similar language between claims highlighted in matching colors.
Unhighlighted text is common to all claims.

# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

_____

                              )

DELAWARE DISPLAY GROUP,    )

LLC and INNOVATIVE         )

DISPLAY TECHNOLOGIES,      )

LLC,                       )

                           )

        Plaintiffs,        )

                           )

   vs.                     ) Civil Action No.

                           ) 13-2112-RGA

VIZIO, INC., et al.,       )

                           )

        Defendants.        )

_____)

VIDEOTAPED DEPOSITION OF THOMAS CREDELLE

Los Angeles, California

Wednesday, August 10, 2016

Reported by:

Lori M. Barkley

CSR No. 6426

Page 38

Q.  I do know he's Canadian, so we're talking --

A.  Okay.  So same guy, yeah.

Q.  Probably -- so have you talked with him in connection with this case?

A.  I have not.

Q.  Have you had discussions with other lawyers outside of Gibson Dunn -- let me say that a different way.

Have you had conversations with lawyers for the other defendants in this case?

MR. LAMAGNA:  Objection, vague.

THE WITNESS:  I -- if the case you're referring to is Vizio, I've only worked with Gibson Dunn.

BY MR. KIMBLE:

Q.  That's a fair caveat.

So there are two other cases that are consolidated for discovery and one of those is pending against LG Electronics and LG Display, two other LG entities, and another action is pending against Lenovo.

Lawyers from Mayer Brown represent LG. Lawyers from now Vinson Elkins represent Lenovo.

Have you had discussions with those lawyers?

A.  About what?

Page 39

MR. LAMAGNA:  Objection, vague.

THE WITNESS:  About what?

BY MR. KIMBLE:

Q.  Have you had discussions with them about anything?

A.  This case.

Q.  Start broader than that.

Have you had discussions with LG's lawyers?

MR. LAMAGNA:  Same objections.

THE WITNESS:  Yeah.  I'd like you to be more specific about what case.  As you know, I worked with Mayer Brown on a IPR for KG Pretech that was not related to the LG.  So I didn't really have any interaction what Mayer Brown on LG's behalf, and I have not worked with Lenovo lawyers.

BY MR. KIMBLE:

Q.  That's fair.  So, yeah, excluding the IPR work.

So let's exclude the IPR work and consider the three cases I mentioned as this case.

Have you had conversations with LG's lawyers?

A.  Not about this case.

Q.  And same for Lenovo's lawyers?

A.  Same for Lenovo's lawyers.

Page 40

Q.  And have you had any communication with LG employees related to this case?

A.  I have not spoken with any LG employees about this case.

Q.  Same for Lenovo?

A.  Same for Lenovo.

Q.  Turning to your report, Exhibit 1, do you have any corrections you'd like to make to the report?

A.  There are two minor corrections.

Q.  Can you let us know what those are?

A.  Yes, I will.  I marked them in my copy.

On page 14 at the bottom in the footnote it says:  Section 4.  It should be Section 6.

Q.  Okay.

A.  Typo.

And on page 46, we describe three displays in paragraph 126, and we discovered we had omitted M3-D 550 SL from that list.  There should be four displays.

And --

Q.  Before you move on.

A.  Yes.

Q.  So on page 46, you're talking about the line that's three lines up from the bottom?

Page 41

A.  Yes, I am.

Q.  And there's three model numbers listed there?

A.  Right.  There should be four.

Q.  Okay.  Go ahead.

A.  You can add M3-D 550 SL.

And at the top of page 47 to be complete, we should add at the end of the first line, TD36 at 12 and 39.

Q.  Any others?

A.  Yes, one other.

We mistakenly, on page 67, we had a list of commercial products using one-sided light guides and we included M3-D 550 SL.

Do you see that?

Q.  I do.

A.  Strike that out.  That's it.

Q.  When did you become aware of these errors?

A.  Just over the past couple days when I was reviewing for this deposition.  I realized there was some, you know, mistakes that we caught.  Thought we should tell you.

Q.  Other -- okay.  So other than those corrections that we've just made, does this report contain all of your opinions regarding

11 (Pages 38 - 41)

Page 138

moved away from CCFLs to LEDs, because in the LED backlight business there are many more suppliers because it's an easier product to make than CCFL backlights.

The CCFL backlights were more concentrated in a few vendors. LED is a much broader range, but there are some leading manufacturers whose names I don't recall that provide these parts to TV makers, so they are sold to -- from the BLU maker to the LCM maker, and then from the LCM maker to the TV maker, and if that's Vizio or maybe they buy from an OEM and put their name on it and sell it to Best Buy and Costco --

Q.   Okay.

A.   -- for distribution.

Q.   So if you have a company like Vizio in the United States, the companies that they would be communicating with directly, their own supplier, shall we say, could vary depending upon business model?

MR. KIMBLE:  Objection, leading.

THE WITNESS:  That's --  you know, as I said, my understanding is that -- let me say my statement is that I don't know what Vizio does, especially in their business model, but there are

Page 139

many options that they have to either, you know, as they make and buy their products.

MR. LAMAGNA:  I don't have any other questions.

MR. KIMBLE:  I have no questions.

VIDEO OPERATOR:  Off the record?

MR. KIMBLE:  Yep.

VIDEO OPERATOR:  We are off the record at 12:23 p.m.

(TIME NOTED:  12:23 p.m.)

Page 140

ACKNOWLEDGMENT OF DEPONENT

I, THOMAS CREDELLE, do hereby certify that I have read the foregoing transcript of my testimony taken on 8/10/16, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

Page   Line            Correction

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

_____

THOMAS CREDELLE

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____    _____
(NOTARY PUBLIC)        MY COMMISSION EXPIRES:

Page 141

STATE OF CALIFORNIA     ) ss.

COUNTY OF LOS ANGELES   )

I, Lori M. Barkley, CSR No. 6426, do hereby certify:

That the foregoing deposition testimony taken before me at the time and place therein set forth and at which time the witness was administered the oath;

That the testimony of the witness and all objections made by counsel at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 18th day of August, 2016.

LORI M. BARKLEY, CSR No. 6426

36 (Pages 138 - 141)

# EXHIBIT I

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------X

DELAWARE DISPLAY GROUP LLC and
INNOVATIVE DISPLAY,

        Plaintiff,

                       Case No. 13-CV-2109-RGA
     vs.                     13-CV-2108-RGA
                              13-CV-2112-RGA

LG ELECTRONICS INC., LG
ELECTRONICS U.S.A., INC., LG
DISPLAY CO., LTD., AND LG
DISPLAY AMERICA, INC.,

        Defendants.

------------------------------X

AND RELATED CROSS-ACTIONS.

------------------------------X

VIDEOTAPED DEPOSITION OF FREDERIC J. KAHN, Ph.D.

Dallas, Texas

August 11, 2016

9:09 a.m.

Reported by:
JANICE K. McMORAN, CSR, RDR, CRR, TCRR
Job No: 45675

158

wavelength between 400 and 700 nanometers. And if you have any structure on the surface that has smaller characteristic changes than 400 to 700 nanometers, light is not going to be deflected by those structures.

Q. So it --

A. So there has to be some height or change in reflectivity.

Q. So the reason the shape must have height to cause light to be emitted is a result of the wavelength of light?

A. Yes. Light typically does not see things that are much smaller than an optical wavelength, certainly that are not smaller -- that are not larger than, say, a quarter of a wavelength.

Q. I'm going to have some questions on Claim 13 now.

A. Okay.

Q. Claim 13 requires a transition region; is that right?

A. It says, "Wherein the panel member has a transition region between at least one input edge and the patterns of light-extracting deformities to allow the light from the at least one light source" --

159

(Cell phone ringing)

THE WITNESS: Is that mine? I thought I turned it off.

A. -- "to mix and spread." Let's see. Let me turn this off. Sorry about that.

BY MS. STREFF:

Q. The '370 patent acknowledges that transition regions are known in the art, correct?

A. Yes.

Q. And is your interpretation of Claim 13 that the transition region must be between the input edge of the panel member and the patterns of deformities on both sides of the panel member?

A. It says between at least one input edge and the patterns of light-extracting deformities, that --

Q. So is it your opinion --

A. And -- but it also says, "and at least one side of the transition region contains optical elements for reflecting or refracting light from at least one light source."

So I think that implies that at least it would be a gap by transition region between the edge and at least the deformities on one side, but that there could be -- or they may or should be

160

deformities on the other side within the transition region.

Q. So if the deformities on one of the sides extends the entire length of the panel all the way to the input edge, would that panel still have a transition device, as recited in Claim 13?

A. Well, it says that there has to be -- there is a transition edge between at least one input edge and the patterns of light-extracting deformities.

So that's one requirement that I read. And then there's yet another requirement where it says that at least one side of the transition region would have reflecting or refracting. Well, it doesn't say deformities. It says optical elements for reflecting or refracting light. So it could be reflection, it could be lenslets or lens arrays.

Q. And so the claim -- Claim 13 requires deformities on both sides of the panel member, correct?

A. Yes.

Q. And the transition region has to be between the input edge of the panel and the patterns, plural, of deformities --

161

A. Of deformities.

Q. -- correct?

A. Correct.

Q. So do you interpret that to mean that the transition region cannot overlap with the deformities on one of the sides of the panel member?

A. Yes. So there should not be deformities in the transition region, but there should be optical elements.

Q. Do you understand when --

A. Which are not deformities.

Q. That was going to be my next question.

Do you agree that optical elements are different than the deformities claimed in Claim 13?

A. Yes.

Q. So, in your opinion, can you point to the same structure on the panel member to be both the patterns -- the patterns of deformities and the optical elements in the transition region?

A. You're asking me to point to -- what do you mean?

Q. Let me rephrase that. If you have -- if you have a panel member with the deformities on one side --

41 (Pages 158 to 161)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

162

A.  Right.

Q.  -- extending the entire length of the panel member --

A.  The entire length, including the supposed transition region?

Q.  Right.  Would it --

A.  But if it extends into this transition region --

Q.  Could you --

A.  -- maybe you no longer have a transition region.

Q.  So, in your opinion, you would not have a transition region between the input edge and the two patterns of deformities in the case where the deformities on one side run the entire length of the panel?

A.  Let me just read this again.

Well, it says there's -- it says there is a gap between the input edge and the pattern of deformities.  And if there are deformities that extend into the transition region, it doesn't seem to satisfy Claim 13.

Q.  If that -- so assuming we still have a panel member with the deformities on one side that go the entire length --

163

A.  Right.

Q.  -- but at the input edge there were lenses --

A.  Yes.

Q.  -- would you consider that panel to have a transition region containing optical elements?

A.  I don't think this claim would consider that a transition region --

Q.  And why not?

A.  -- the way I'm reading it now.  Because it's the same pattern that extends to the edge.  There's no transition region.  There's nothing to transition to.

I reserve the right to reconsider this answer when we talk specific embodiments, but my reading of -- this is my reading of Claim 13 as it stands now, in answering your question to the best of my ability.

Q.  Why would your understanding of Claim 13 change?

A.  I don't know.  Maybe -- maybe new information or information that I had forgotten about might present itself.  But I'm -- right now we're talking specifically about Claim 13, and it seems to say -- it seems to say that there are no

164

optical deformities in the transition region.

Q.  But as a person of ordinary skill in the art, reading Claim 13, you understand that the transition region must be between the input edge and the patterns of deformity, as on both sides of the panel member, correct?

A.  That's my understanding.  And if that distance is zero, there is no transition region.

Q.  And it's also your understanding that the optical elements in the transition region are different structures than the deformities in the output region.

A.  Absolutely.  So if you -- if you try to put lenslets in there, then you could -- you could start to argue whether these are optical deformities, but their purpose would be to have a lens function rather than a deflection function.

MS. STREFF:  I think we need to take a quick break to fix a technical difficulty.

THE VIDEOGRAPHER:  Off the record at 4:00 o'clock.

(Recess taken 4:00 p.m. - 4:14 p.m.)

THE VIDEOGRAPHER:  On the record at 4:14.

165

BY MS. STREFF:

Q.  So, Dr. Kahn, I'd like to move to paragraph 372 of your expert report.

A.  We're really moving along here.  Okay.

Q.  And in here you contend that Dr. Escuti hasn't made any allegations of the on-sale date for the Compaq Contura 4/25C product; is that right?

A.  That's what it says, yes.  But in his reply report, he provided more information.

Q.  And so do you agree that the Compaq Contura 4/25C was on sale at least by August 1993?

A.  I haven't checked those dates.

Q.  Well, what's your basis for contending that he's made no such showing that it was on sale by August 1993?

A.  Oh, originally he presented no evidence, that I saw, for his saying that it was on sale.  He said it was on sale by, and now he's -- in his reply report, he has provided more specifics supporting the various dates, presumably including the Compaq Contura, but I haven't checked that particular one.

Q.  Well, did you review the documents cited in footnote 4 of Dr. Escuti's opening expert report related to his statement that they were on sale?

A.  You'd have to remind me what was in

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

226

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


------------------------------X

DELAWARE DISPLAY GROUP LLC and
INNOVATIVE DISPLAY,

                Plaintiff,
                                    Case No. 13-CV-2109-RGA
            vs.                              13-CV-2108-RGA
                                             13-CV-2112-RGA
LG ELECTRONICS INC., LG
ELECTRONICS U.S.A., INC., LG
DISPLAY CO., LTD., AND LG
DISPLAY AMERICA, INC.,

                Defendants.

------------------------------X

AND RELATED CROSS-ACTIONS.

------------------------------X




                REPORTER'S CERTIFICATION
            ORAL AND VIDEOTAPED DEPOSITION OF
                 FREDERIC J. KAHN, Ph.D.
                      VOLUME 1
                   AUGUST 11, 2016


            I, Janice K. McMoran, RDR, CRR, TCCR, and

Certified Shorthand Reporter in and for the State of

Texas, hereby certify to the following:

            That the witness, FREDERIC J. KAHN, Ph.D., was

duly sworn by the officer and that the transcript of the

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

227

oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Errata contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken.  Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 14th day of August, 2016.

_Janice K. McMoran_____

JANICE K. McMORAN, RDR, CRR, TCRR
Texas CSR #1959
Expiration Date:  12/31/16

David Feldman Worldwide
450 Seventh Avenue, Suite 500
New York, New York 10123
(212) 705-8585

# EXHIBIT J

230

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------X

DELAWARE DISPLAY GROUP LLC and
INNOVATIVE DISPLAY,

         Plaintiff,

                         Case No.  13-CV-2109-RGA
       vs.                     13-CV-2108-RGA
                                 13-CV-2112-RGA

LG ELECTRONICS INC., LG
ELECTRONICS U.S.A., INC., LG
DISPLAY CO., LTD., AND LG
DISPLAY AMERICA, INC.,

         Defendants.

------------------------------X

AND RELATED CROSS-ACTIONS.

------------------------------X

CONTINUED VIDEOTAPED

DEPOSITION OF FREDERIC J. KAHN, Ph.D.

Dallas, Texas

August 12, 2016

9:08 a.m.

Reported by:
JANICE K. McMORAN, CSR, RDR, CRR, TCRR
Job No: 45677

331

Q. And so it isn't the case that all deformities that one could observe on a panel are necessarily light-extracting deformities?

A. It depends on the size, the shape, and -- and the scale.

Q. And --

A. So under a microscope, an electron microscope, we would see that the surface is really not uniform. It's rough. But that roughness would be at a scale much finer than an optical wavelength and would not be relevant, would not -- would not light extract.

Q. Of course.

A. But if you etched that away, then you could create light extraction with similar shapes but different sizes.

Q. And you agree that the orientation of the deformity can also be a factor?

A. Correct.

Q. Let's look at, I guess -- same line we were looking at there at line 17, Claim 1, it says, "The pattern of light-extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member." Do you see that?

332

A. I do.

Q. So you agree that the pattern of deformities for the '370 patent have to vary along at least the length or the width of the panel, correct?

A. For that particular claim.

Q. And for the record, could you tell me what the term "pitch" means in the context of a pattern?

A. Okay. Well, "pitch" generally replies to the -- the distance between optical structures such as deformities. So -- so what is -- how often are they repeated on the surface.

Q. So in lay terms --

A. Let me say how often in dimensions are they repeated, at what distances are they repeated, like the width of a traffic lane.

Q. So, in general terms, the pattern on something like a checkerboard has a constant pitch along its length and a constant pitch along its width?

A. Traditional checkerboards do have that feature.

Q. Now, with respect to the language we see here, if -- in the '370 patent, if the pitch in the pattern of deformities did not vary along the length

333

or width of the panel member, then the pattern would not vary as required by that claim, right?

A. The claim is asking that the pattern vary.

Q. And so my question is --

A. Let's see, I -- so, let's see, I don't see pitch mentioned here.

Q. If the pattern looks like a checkerboard where you have no variation in pitch in the X axis and no variation in pitch on the Y axis, then the pattern wouldn't vary, correct?

A. Correct.

Q. Okay. So in that example, if you have a checkerboard-type pattern where you have the same pitch along the length and the same pitch along the width of the light guide, it wouldn't fall within this claim limitation?

A. Correct.

Q. And let's go back up a couple of lines to line 15. It says that "the light-extracting deformities have to be projections or depressions." Do you see that?

A. Yes, that are projections or depressions.

Q. Are all light-extracting deformities necessarily projections or depressions on or in the surface of the light guide?

334

A. Well, you get into some fine things like if you deposited a pattern of materials with different indices of reflection such that you would defeat total internal reflection.

These -- these could be very small. They could be, say, an optical wavelength in thickness. And then you'd have to argue how large does this projection have to be in order to be called a projection.

Q. So all light-extracting deformities don't necessarily have to be projections or depressions?

A. Correct.

Q. What would you need to do to determine whether a deformity is a projection or depression?

A. You'd want to measure it.

Q. Could you give me examples as to how one might measure it? You mean measure the amount that it either recesses into the light guide or projects from the light guide?

A. Correct.

Q. How might one do that?

A. Well, optically, you could look at the size in any microscope with an appropriate scale. You could take a stylus and measure the topography. So you could do it with optical microscopy, electron

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  1.800.642.1099

359

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


------------------------------X

DELAWARE DISPLAY GROUP LLC and
INNOVATIVE DISPLAY,

                    Plaintiff,
                                    Case No. 13-CV-2109-RGA
          vs.                                13-CV-2108-RGA
                                             13-CV-2112-RGA
LG ELECTRONICS INC., LG
ELECTRONICS U.S.A., INC., LG
DISPLAY CO., LTD., AND LG
DISPLAY AMERICA, INC.,

                    Defendants.

------------------------------X

AND RELATED CROSS-ACTIONS.

------------------------------X



                REPORTER'S CERTIFICATION
          ORAL AND VIDEOTAPED DEPOSITION OF
                 FREDERIC J. KAHN, Ph.D.
                       VOLUME 2
                   AUGUST 12, 2016


          I, Janice K. McMoran, RDR, CRR, TCCR, and

Certified Shorthand Reporter in and for the State of

Texas, hereby certify to the following:

          That the witness, FREDERIC J. KAHN, Ph.D., was

duly sworn by the officer and that the transcript of the

360

oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Errata contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys to the action in which this proceeding was taken.  Further, I am not a relative or employee of any attorney of record in this cause, nor am I financially or otherwise interested in the outcome of the action.

Subscribed and sworn to on this the 15th day of August, 2016.

_Janice K. McMoran_____

JANICE K. McMORAN, RDR, CRR, TCRR
Texas CSR #1959
Expiration Date:  12/31/16

David Feldman Worldwide
450 Seventh Avenue, Suite 500
New York, New York 10123
(212) 705-8585

# EXHIBIT K

Trials@uspto.gov
571-272-7822

Paper 11
Entered:  January 13, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LG DISPLAY CO., LTD.,
Petitioner,

v.

INNOVATIVE DISPLAY TECHNOLOGIES LLC,
Patent Owner.

_____

Case IPR2014-01096
Patent 7,537,370

_____

Before THOMAS L. GIANNETTI, NEIL T. POWELL, and
BEVERLY M. BUNTING, *Administrative Patent Judges*.

GIANNETTI, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2014-01096
Patent 7,537,370

LG Display Co., Ltd. ("Petitioner") filed a Corrected Petition[1] pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1, 4, 8, 13, 15, 27, 29, and 47 of U.S. Patent No. 7,537,370 ("the '370 patent"). Paper 4 ("Pet."). Innovative Display Technologies LLC ("Patent Owner") filed a Preliminary Response. Paper 9 ("Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we grant the Petition and institute an *inter partes* review of claims 15 and 27. We deny the Petition as to the other claims challenged.

## I.  BACKGROUND

### A.  The '370 patent (Ex. 1001)

The '370 patent is entitled "Light Emitting Panel Assemblies." The Abstract describes the subject matter as follows:

> Light emitting panel assemblies include an optical panel member having a pattern of light extracting deformities on or in one or both sides to cause light to be emitted in a predetermined output distribution. The pattern of light extracting deformities on or in one side may have two or more different types or shapes of deformities and at least one of the types or shapes may vary along the length or width of the panel member. Where the light extracting deformities are on or in both sides, at least some of the deformities on or in one side may be of a different type or shape or vary in a different way or manner than the deformities on or in the other side.

Ex. 1001, Abstract.

---

[1] In this proceeding we will refer to the Corrected Petition as "the Petition."

2

Case IPR2014-01096
Patent 7,537,370

### B.   Illustrative Claim(s)

Claim 1 is illustrative of the claims at issue:

> 1. A light emitting panel assembly comprising at least one light source,
>
> an optical panel member having at least one input edge for receiving light from the at least one light source, the panel member having front and back sides and a greater cross sectional width than thickness,
>
> both the front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution,
>
> where the pattern of light extracting deformities on or in at least one of the sides varies along at least one of the length and width of the panel member and
>
> at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member, and
>
> at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss.

### C.  Related Proceedings

Patent Owner states that it has asserted infringement by Petitioner of the '370 patent in the following proceeding: Delaware Display Group LLC et al. v. LG Electronics, Inc. et al., No. 1:13-cv-02109 (D. Del., filed Dec. 31, 2013).  Paper 7.

Patent Owner identifies numerous other proceedings in which it has alleged infringement of the '370 patent.  *See* Paper 7 for a listing.

In addition, there are four other pending requests for *inter partes* review by Petitioner for patents related to the '370 patent.  *Id*.  Those are as follows:

3

Case IPR2014-01096
Patent 7,537,370

    1. IPR2014-01092 (U.S. Patent No. 7,434,974);

    2. IPR2014-01094 (U.S. Patent No. 7,404,660)

    3. IPR2014-01095 (U.S. Patent No. 8,215,816); and

    4. IPR2014-01097 (U.S. Patent No. 7,300,194).

### D.  Claim Construction

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

The only claim term for which Petitioner proposes a construction is the term "deformities," appearing in all challenged claims.  Petitioner asserts that the '370 patent "expressly defines" the term to mean "any change in the shape or geometry of a surface and/or coating or surface treatment that causes a portion of light to be emitted."  Pet. 7 (citing '370 patent, Ex. 1001, col. 4, ll. 36–40).  Patent Owner takes no position on claim construction.  Prelim. Resp. 4.  Patent Owner points out, however, that the construction of "deformities" proffered by Petitioner was agreed to and adopted by the district court.  *Id.* at 5.

We have considered Petitioner's construction of "deformities" and determined that at this stage it should be adopted here.

We have further determined that, except as may be indicated in the discussion below, the remaining terms should be given their plain and ordinary meaning.

4

Case IPR2014-01096
Patent 7,537,370

### E. References

Petitioner relies on the following references[2]:

| Pristash | US 5,005,108 | Apr. 2, 1991 | Ex. 1006 |
| Ohe | EP 0 500 960 A1 | Feb. 9, 1992 | Ex. 1007 |
| Kobayashi | US 5,408,388 | Apr. 18, 1995 | Ex. 1008 |

Petitioner also states that it is relying on Admitted Prior Art ("APA") from the '974 patent specification. Pet. 8; Ex. 1001, col. 2, ll. 58–65. Petitioner also relies on a Declaration from Michael J. Escuti, Ph.D. ("Escuti Decl."). Ex. 1004.

### F. Grounds Asserted

Petitioner challenges claims 1, 4, 8, 13, 15, 27, 29, and 47 of the '370 patent on the following grounds.

| References | Basis | Claims Challenged |
|---|---|---|
| Pristash | § 103(a) | 1, 4, 8, 13, 15, 27, 29, and 47 |
| Ohe | § 102(b) | 1, 4, 8, and 29 |
| Kobayashi | § 102(a) | 1, 4, and 29 |
| Kobayashi and Pristash | § 103(a) | 13, 15, 27, and 47 |

## II. ANALYSIS

### A. Asserted Grounds Based On Pristash
### (Claims 1, 4, 8, 13, 15, 27, 29, and 47)

Petitioner contends that these claims are obvious over Pristash under 35 U.S.C. § 103(a). Pet. 11–25. For the reasons that follow, we are not persuaded that Petitioner has a reasonable likelihood of prevailing on this ground.

---

[2]  The references are ordered by exhibit number with effective dates asserted by Petitioner.

5

Case IPR2014-01096
Patent 7,537,370

### 1. Pristash Overview

This patent describes a thin panel illuminator that includes a solid transparent panel member having one or more deformed output regions. Ex. 1006, Abstract. The arrangement causes light entering the panel along an input edge to be emitted along the length of the panel. *Id.*

This is illustrated in Figure 1 of Pristash, reproduced here:



In the above Figure 1, light emitting panel 2 and disruptions 16 in the exterior surface 18 of the panel are shown. Ex. 1006, col. 3, ll. 9–48.

### 2. Discussion

Petitioner asserts that "Pristash discloses Claims 1, 4, 8, 13, 15, 27, 29, and 47 of the '370 Patent and therefore those claims are obvious under 35 U.S.C § 103." Pet. 14. For example, Petitioner identifies the claimed "light emitting panel assembly" with Figure 1 of Pristash. Pet. 14.

6

Case IPR2014-01096
Patent 7,537,370

>    a.  Claims 1, 4, 8, and 13

Patent Owner asserts that Pristash fails to disclose the following feature of independent claims 1 and 13: "light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member." Prelim. Resp. 3. Patent Owner asserts that Petitioner's claim charts and the Escuti Declaration do not provide sufficient proof that this feature is present. Prelim. Resp. 5–6. Patent Owner asserts that for this reason, among others[3], Petitioner's obviousness challenge to these claims based on Pristash fails. *Id*. at 5–7.

We agree with Patent Owner that the references in the Petition to Figures 5 and 6 of Pristash, and the cited portions of the Escuti Declaration, establish only that: (1) Pristash discloses different types of deformities (Escuti Decl. ¶ 83), and (2) Pristash discloses deformities on both sides of the panel member (*id*. ¶ 84). Prelim. Resp. 6. We determine that this is insufficient to establish a disclosure or suggestion in Pristash of having *different* deformities on both sides of the panel. We are, therefore, not persuaded by the Escuti Declaration's conclusion that "one of ordinary skill in the art would understand Pristash to disclose that deformities on one side may be of a different type than deformities on the other side" (Escuti Decl. ¶ 85). Neither the Petition nor the Declaration provides any convincing rationale for that conclusion. For claims 1 and 13 (and for their dependent claims 4 and 8), Petitioner, therefore, fails to present sufficient evidence to meet the standard of *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 417

---

[3] Patent Owner asserts also that Pristash does not describe the claimed "transition region." Prelim. Resp. 8. This argument is discussed infra in our analysis of claim 27.

7

Case IPR2014-01096
Patent 7,537,370

(2007)(Obviousness showing requires "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.") (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). For the foregoing reasons, therefore, we agree with Patent Owner that Petitioner has not demonstrated a reasonable likelihood of prevailing in proving that independent claims 1 and 13 (and dependent claims 4 and 8) would have been obvious over Pristash.

### b. Claim 15

Petitioner's analysis of claim 15 in relation to Pristash appears at pages 22–24 of the Petition and at paragraphs 114–123 of the Escuti Declaration. As the Declaration states, "[c]laim 15 is similar to claim 1, except that claim 15 further requires that the pattern of light extracting deformities on or in the at least one side has at least two different types of light extracting deformities with one type along the length of the panel member." Escuti Decl. ¶ 115. That is, where claims 1 and 13 require *opposite* sides of the panel to have different types of deformities, claim 15 requires the *same* side of the panel to have different types of deformities.

Patent Owner's response does not address claim 15 in its discussion of Pristash. *See* Prelim. Resp. 5–14. We have reviewed Petitioner's analysis of Pristash, particularly with respect to this feature (Pet. 22–23, citing Pristash Figs. 5 and 6), and find it sufficient to demonstrate that Petitioner has a reasonable likelihood of prevailing on this challenge to claim 15 based on obviousness over Pristash.

### c. Claim 27

Independent claim 27 contains the following language similar to that in claim 15: "the pattern of light extracting deformities on or in the at least

8

Case IPR2014-01096
Patent 7,537,370

one side has at least two different types of light extracting deformities."
Petitioner's analysis of claim 27 in relation to Pristash appears at pages
24–25 of the Petition and at paragraphs 51–52 of the Escuti Declaration. We
determine for the reasons stated above for claim 15, that Petitioner has
demonstrated it is reasonably likely to prevail on this challenge to claim 27.

As stated in the Escuti Declaration, one respect in which claim 27
differs from claim 1 is in requiring a "transition region" between the input
edge of the panel and the pattern of deformities. Escuti Decl. ¶ 125.
Petitioner identifies item 5 in Fig. 1 of Pristash as a "transition device"
meeting the transition region recitation. *Id.* ¶ 107. Patent Owner responds
that transition device 5 in Pristash is not a "transition region" as claimed
because it is not "part of the panel member." Prelim. Resp. 8, 11. We are
not persuaded by Patent Owner's argument. Patent Owner points to nothing
in the '370 patent specification that requires the transition region to be
integral with the panel, and not a separate part as shown in the '370 patent.
We, therefore, do not construe the phrase "the panel member has a transition
region" as requiring an integral structure. The transition device described in
Pristash, therefore, meets this limitation.

Finally, Patent Owner contends that Petitioner fails to demonstrate
that the requirement that "at least one side of the transition region contains
optical elements" is met by Pristash. Prelim. Resp. 11. A similar limitation
appears in claim 13. According to Patent Owner, the single lens disclosed in
Figure 19 of Pristash (Escuti Decl. ¶ 112) does not meet this requirement for
plural "optical elements." Prelim. Resp. 12, 14. We are not persuaded by
this argument. Nothing in the '370 patent specification suggests that
"optical elements" should be restricted to one lens, or that using two or more

9

Case IPR2014-01096
Patent 7,537,370

lenses instead of one would not have been obvious. Moreover, Figures 15 and 18 of Pristash show multiple "optical elements." Ex. 1006, col. 7, ll. 18, 50–51.

d. Claims 29 and 47

These independent claims contain the following language similar to language in claims 1 and 13: "at least some of the light extracting deformities on or in one of the sides vary in a different way or manner than the light extracting deformities on or in the other side of the panel member." For the reasons discussed above for claims 1 and 13, we determine that Petitioner has not demonstrated a reasonable likelihood of prevailing on its challenge to claims 29 and 47 over Pristash.

*B. Asserted Grounds Based On Ohe (Claims 1, 4, 8, and 29)*

Petitioner contends that these claims are anticipated by Ohe under 35 U.S.C. § 102(b). Pet. 22–37.[4] For the reasons that follow, we are not persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on this challenge.

1. Ohe Overview

Ohe describes a surface light source element for a surface light source device that can be used as a back light for a liquid crystal display. Ex. 1007, p. 2, ll. 3–5. The device has a rectangular light guide with a light emitting surface, a diffusing member, and a light source. This is illustrated by Figure 4 of Ohe reproduced here:

---

[4] The heading for this section in the Petition (Pet. 29) also lists claim 15, but because no analysis is provided we do not consider this ground of challenge.

10

Case IPR2014-01096
Patent 7,537,370

FIG.4



In Figure 4 above, light guide 1, reflective layer 2, light diffusing member 3, light source 4, reflector 5, light emitting surface 6, and flat areas 8 formed on the roughened surface 9 are shown. Ex. 1007, p. 4, l. 56–p. 5, l. 10. The ratio of the flat areas to the roughened surface varies so that the ratio increases as the distance from the light source increases to regulate the light through the light emitting surface and make it uniform. *Id.* at p. 5, ll. 7–10.

### 2. Discussion

Petitioner contends that Ohe "discloses each and every element" of claims 1, 4, 8, and 29. Pet. 30–38. Patent Owner responds that Ohe fails to meet the element "light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member" in claim 1 and the similar language appearing in claim 29. *See* discussion *supra*.

Both claims 1 and 29 also require "a pattern of light extracting deformities *that are projections or depressions*." (Emphasis added.) Petitioner identifies the roughened surfaces 9 in Ohe as these "deformities." Pet. 32; Escuti Decl. ¶¶ 164. According to the Escuti Declaration, "one of

11

Case IPR2014-01096
Patent 7,537,370

ordinary skill in the art would understand the roughened surfaces of Ohe to be deformities as defined by the '370 patent." *Id.*

Our construction of the term "deformities" includes "any change in the shape or geometry of a surface and/or coating or surface treatment that causes a portion of light to be emitted." *See supra.* The language of claims 1 and 29, however, is narrower, specifying "deformities that are depressions or projections." Petitioner does not explain how Ohe's "roughened surfaces" are "projections" or "depressions," as required by the claims. Thus, Petitioner has not demonstrated that this limitation is met by Ohe.

Petitioner's analysis of Ohe in relation to these claims is unavailing for another reason. To meet the requirement of having different types of deformities on opposite sides of the panel, Petitioner cites the description in Ohe of the dies used to form the plastic light guide 1. Escuti Decl. ¶¶ 166–67. According to Petitioner, the use of different dies (Die 2 and Die 3) provides different types of deformities on the opposite sides of the light guide. *Id.* We are not persuaded by this argument. As noted, the claim language requires "a pattern of light extracting deformities that are projections or depressions." As described by Ohe, Die 3 is produced from a brass plate whose surface is "polished by a buff with an emery-paper No. 800." Ex. 1007, p.6, ll. 37–38 (emphasis added). This suggests that the resulting plastic surface would be flat, not roughened. Petitioner has not shown there are "deformities that are projections or depressions" on the opposing surface 6 formed by Die 3, or that any such pattern arrangement of deformities that would result.

12

Case IPR2014-01096
Patent 7,537,370

### C. Asserted Grounds Based on Kobayashi (1, 4, and 29)

Petitioner contends that these independent claims are anticipated by Kobayashi under 35 U.S.C. § 102(b).  Pet. 38–46.  For the reasons that follow, we are not persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on this ground.

### 1. Kobayashi Overview

This patent describes planar illuminating device used as a backlight for liquid crystal displays.  Ex. 1008, col.1, ll. 6–9.  The device has a rectangular light transmitting plate of a transparent material.  *Id.*, col. 4, ll. 10–11.  One side of the plate has prismatic cuts.  *Id.*, col. 4, l. 27.  The other side has a reflecting finish, e.g., an array of spot-shaped light reflecting layers.  *Id.*, col. 4, ll. 28–29.  This is illustrated by Figure 2 of Kobayashi, reproduced here:



FIG. 2

In Figure 2 above, light plate 2, fluorescent lamps 3, and array of spot-shaped reflective layers 22 (e.g., of white paint or aluminum vapor deposition) are shown.  *Id.*, col 4, ll. 45–47.

13

Case IPR2014-01096
Patent 7,537,370

### 2. Discussion

Petitioner contends that Kobayashi discloses all elements of claims 1, 4, and 29. Pet. 40. Patent Owner identifies both the prismatic cuts and the array of spot-shaped light reflecting layers as "deformities." *See* Pet. 39 ("prismatic cuts 21 on both the top surface and a spot shaped light reflecting layer 22 on the bottom surface (surface deformities)"); Escuti Decl. ¶ 203. The language of the claims, however, specifies "a pattern of light extracting deformities that are projections or depressions." Petitioner does not explain how the spot-shaped reflecting layers, produced by white paint or aluminum vapor deposition, qualify as "projections or depressions." The analysis in the Escuti Declaration (¶ 203) states: "'deformities' are understood to be 'any change in the shape or geometry of the panel surface and/or coating or surface treatment that causes a portion of the light to be emitted.'" The Escuti Declaration, however, does not take into account the claim language limiting "deformities" to "projections or depressions." Accordingly, we determine that Petitioner has not demonstrated a likelihood of prevailing on this challenge.

### D. Asserted Grounds Based on Kobayashi and Pristash
### (Claims 13, 15, 27, and 47)

Petitioner contends that these claims would have been obvious in light of Kobayashi and Pristash. Pet. 46–58. For the reasons that follow, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on this challenge to claims 15 and 27, but not claims 13 or 47.

Claims 13, 27, and 47 all require a "transition region." Petitioner acknowledges that Kobayashi does not "explicitly" disclose a transition

14

Case IPR2014-01096
Patent 7,537,370

region. Pet. 47. Petitioner, therefore, contends that it would have been obvious to combine Pristash's transition region with Kobayashi. Petitioner asserts that this combination would have been obvious because "transition devices were known at the time for mixing and spreading light from the light source to the light guide." *Id.* The Escuti Declaration (¶¶ 230–33) provides additional support for this contention.

Patent Owner responds (Prelim. Resp. 17) by restating its assertion that Pristash does not disclose a transition region. *See supra.* For the reasons previously stated, we are not persuaded by Patent Owner's argument. We conclude, therefore, that Petitioner has provided a sufficient rationale for combining Pristash and Kobayashi, and that combining the references would provide a structure meeting the claims.

### 1. Claims 13 and 47

Claim 13 requires "light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member." *See* discussion supra. Claim 47 contains similar language.

As discussed supra, we determine that Petitioner has failed to present sufficient proof that this arrangement is described either in Kobayashi or Pristash. Therefore, we conclude that even by combining these references, Petitioner has not shown it is reasonably likely to succeed in this challenge to claims 13 and 47.

### 2. Claims 15 and 27

As noted, claim 15 requires that "the pattern of light extracting deformities on or in the at least one side has at least two different types of light extracting deformities," with one type varying along the length of the

15

Case IPR2014-01096
Patent 7,537,370

panel member. Claim 27 contains similar language. Petitioner relies on Figures 5 and 6 of Pristash as meeting this limitation. Patent Owner does not challenge this argument. We have reviewed this argument and find it convincing. For claim 27, Patent Owner's additional argument is that the requirement in the claim that at least one side of the transition region contains "optical elements" is not met. Prelim. Resp. 18. For the reasons previously stated, we do not find this argument convincing.

Based on this record, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on this challenge.


### E. Real Party-in-Interest

Patent Owner contends that the Petition should be denied because Petitioner has failed to name two real parties-in-interest. Pet. 18. They are LG Electronics Inc. and LG Electronics U.S.A. Inc. *Id*.

Patent Owner fails to provide convincing evidence that LG Electronics Inc. is a real party-in-interest. According to Patent Owner, "[w]e know LG Electronics Inc. is a real party in interest because it owns 37.9% of Petitioner and because it has admitted to being a related party to Petitioner." *Id*. We are not persuaded by this argument. As the Office Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2014), makes clear, and as Patent Owner acknowledges (Prelim. Resp. 19), an important factor in determining real party in interest is control or the ability to control the proceeding. *Zoll Lifecor Corp. v. Philips Elect. North America Corp*, IPR2013-00609 (PTAB Mar. 20, 2014), Paper 15, slip op. at 10. In *Zoll*, the Board relied on the fact that the party determined to be a real party-in-interest (Zoll Medical) controlled 100 % of the petitioner (Zoll Lifecor).

16

Case IPR2014-01096
Patent 7,537,370

Here, LG Electronics Inc. is not even a majority owner of Petitioner. And the fact that the attorneys representing Petitioner here also represent LG Electronics Inc. in a district court lawsuit involving the '370 patent, without more, is insufficient evidence of control of this proceeding by LG Electronics.

Patent Owner also fails to provide convincing evidence that LG Electronics U.S.A. Inc. is a real party-in-interest. Patent Owner sole argument states "[w]e know that LG Electronics U.S.A., Inc. is a real party-in-interest because it is 100 % owned by LG Electronics, Inc." Prelim. Resp. 18–19. But Patent Owner has not provided sufficient proof that LG Electronics Inc. is a real party-in-interest. *See supra*. Therefore, Patent Owner's contention that LG Electronics U.S.A. Inc. also is a real party-in-interest simply because it is "100% owned by LG Electronics, Inc." is not persuasive.

We therefore determine that the Petition should not be denied on this ground.


### III. SUMMARY

The information presented shows there is a reasonable likelihood that Petitioner will prevail on the following challenges to patentability of the '370 patent:

A. Anticipation of claims 15 and 27 by Pristash; and

B. Obviousness of claims 15 and 27 over Kobayashi and Pristash.

The information presented does not show there is a reasonable likelihood that Petitioner will prevail on any of the following challenges to patentability of the '370 patent:

Case IPR2014-01096
Patent 7,537,370

C. Obviousness of claims 1, 4, 8, 13, 29, and 47 over Pristash;

D. Anticipation of claims 1, 4, 8, 15, and 29 by Ohe;

E. Anticipation of claims 1, 4, and 29 by Kobayashi; and

F. Obviousness of claims 13 and 47 over Kobayashi and Pristash.

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim or the construction of any claim term.

## IV.  ORDER

It is, therefore,

ORDERED that the Petition is *granted* as to claims 15 and 27 of the '370 patent and *denied* as to all other challenged claims;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted on the following grounds:

A. Anticipation of claims 15 and 27 by Pristash; and

B. Obviousness of claims 15 and 27 over Kobayashi and Pristash;

FURTHER ORDERED that no other proposed grounds of unpatentability are authorized; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this decision.

18

Case IPR2014-01096
Patent 7,537,370

PETITIONER:

Robert G. Pluta
Amanda K. Streff
Baldine B. Paul
Anita Y. Lam
MAYER BROWN LLP
rpluta@mayerbrown.com
astreff@mayerbrown.com
bpaul@mayerbrown.com
alam@mayerbrown.com


PATENT OWNER:

Justin B. Kimble
BRAGALONE CONROY P.C.
jkimble@bcpc-law.com

# EXHIBIT L

Filed on behalf of Innovative Display Technologies LLC
By:    Justin B. Kimble (JKimble-IPR@bcpc-law.com)
       Bragalone Conroy PC
       2200 Ross Ave.
       Suite 4500 – West
       Dallas, TX 75201
       Tel: 214.785.6670
       Fax: 214.786.6680

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

K.J. PRETECH CO., LTD.,
Petitioner,

v.

INNOVATIVE DISPLAY TECHNOLOGIES LLC,
Patent Owner.

Case IPR2015-01867
U.S. Patent No. 7,537,370

**PATENT OWNER'S PRELIMINARY RESPONSE TO PETITION FOR
*INTER PARTES* REVIEW**

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450

Case IPR2015-01867
Patent 7,537,370

## I.    **INTRODUCTION**

Pursuant to 37 C.F.R. § 42.107, Innovative Display Technologies ("IDT" or "Patent Owner") files this Preliminary Response requesting that the Board deny institution of the Petition filed by K.J. Pretech Co. Ltd. ("Petitioner") challenging U.S. Patent No. 7,537,370 (the "'370 patent"). Patent Owner has timely filed this Preliminary Response within three months of the September 22, 2015, notice of filing response date accorded to the Petition (Paper 3). 35 U.S.C. § 313 and 37 C.F.R. § 42.107.

The Board should deny this Petition because (1) it is time-barred, and (2) none of the grounds in the Petition presents a reasonable likelihood of Petitioner prevailing. Patent Owner discusses those points in detail in its Argument section below. Before that discussion begins, Patent Owner includes the following sections designed to provide the Board with background information.

### A. Grounds in the Petition

The Petition includes five Grounds:

Ground 1: § 103(a) over Kobayashi (claims 1, 4, 29)

Ground 2: § 103(a) over Kobayashi and Pristash (claims 13 & 47)

Ground 3: Under § 103(a) over Suzuki (claims 1, 4, 5, 9, 13, 29, 47)

Ground 4: Under § 103(a) over Suzuki and Pristash (claims 13 & 47)

Ground 5: Under § 103(a) over Suzuki and Murata (claims 1, 4, 5, 9, 13)

Those grounds address independent claims 1, 13, 29 and 47.

1

Case IPR2015-01867
Patent 7,537,370

### B. The '370 patent

The '370 patent claims priority back to June 15, 1995. The patent generally discloses "light emitting panel assemblies" made from a specific arrangement of components that, when combined, create "very efficient panel assemblies that may be used to produce increased uniformity and higher light output from the panel members with lower power requirements, and allow the panel members to be made thinner and/or longer, and/or of various shapes and sizes." Ex. 1001 at 1:66 through 2:3.

At the time of the priority date of the '370 patent, the claimed inventions introduced novel components and a novel arrangement of those components. For example, the claims of the '370 patent include such things as (1) a panel member with both its front and back sides having a pattern of light extracting deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution; (2) the pattern of light extracting deformities varies along at least one of the length and width of the panel member; (3) the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member; (4) at least one film, sheet or substrate overlying at least a portion of one of the sides of the panel member to change the output distribution of the emitted light such that the light will pass through a liquid crystal display with low loss; (5) the panel

2

member has a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread; and (6) the transition region contains optical elements for reflecting or refracting light from the at least one light source.

The written description of the '370 patent explains that the panel's deformities are "any change in the shape or geometry of the panel surface and/or coating or surface treatment that causes a portion of the light to be emitted." Ex. 1001 at 4:38-40.

The '370 patent further explains that "a pattern of light extracting deformities or disruptions may be provided on one or both sides of the panel members or on one or more selected areas on one or both sides of the panel members, as desired." *Id.* at 4:31-34 (emphasis added). The '370 also describes the deformities on both sides of the panel by stating that "a pattern of light extracting deformities 21, 23, 24 and/or 25 may be provided on one or both sides of the panel member in order to change the path of the light so that the internal critical angle is exceeded and a portion of the light is emitted from one or both sides of the panel." *Id.* at 6:15-20. The deformities 21, 23, 24, and 25 discussed in that passage are depicted in Figs. 4a-4d:

3

Case IPR2015-01867
Patent 7,537,370



FIG.4a

FIG.4b

FIG.4c

FIG.4d

The '370 patent describes the functionality of the deformities with reference to Fig. 4a above: "[t]he pattern of light extracting deformities 21 shown in FIG. 4a includes a variable pattern which breaks up the light rays such that the internal angle of reflection of a portion of the light rays will be great enough to cause the light rays either to be emitted out of the panel through the side or sides on which the light extracting deformities 21 are provided or reflected back through the panel and emitted out the other side." Ex. 1001 at 4:40-47.

The '370 patent also describes varying the deformities to achieve a uniform light output distribution: "[v]arying the percentages and/or size of deformities in different areas of the panel is necessary in order to provide a uniform light output

4

Case IPR2015-01867
Patent 7,537,370

distribution. For example, the amount of light traveling through the panels will ordinarily be greater in areas closer to the light source than in other areas further removed from the light source. A pattern of light extracting deformities 21 may be used to adjust for the light variances within the panel members, for example, by providing a denser concentration of light extracting deformities with increased distance from the light source 3 thereby resulting in a more uniform light output distribution from the light emitting panels." *Id.* at 5:5-16.

The '370 patent also notes that the deformities can control the output distribution of emitted light to fit a particular application, such as backlighting a liquid crystal display: "[t]he deformities 21 may also be used to control the output ray angle distribution of the emitted light to suit a particular application. For example, if the panel assemblies are used to provide a liquid crystal display backlight, the light output will be more efficient if the deformities 21 cause the light rays to emit from the panels at predetermined ray angles such that they will pass through the liquid crystal display with low loss." *Id.* at 5:17-23. As described in that passage, the deformities can cause light rays to emit at predetermined angles such that those light rays can pass through an LCD with low loss.

The written description of the '370 patent goes into great detail about the various ways that the deformities can vary. The '370 patent describes how the deformities may vary in shape: "Print patterns of light extracting deformities 21 may

5

Case IPR2015-01867
Patent 7,537,370

vary in shapes such as dots, squares, diamonds, ellipses, stars, random shapes, and the like, and are desirably 0.006 square inch per deformity/element or less." Ex. 1001 at 5:34-37. The '370 patent continues, stating that "the deformities may vary in shape and/or size along the length and/or width of the panel members." *Id.* at 5:43-44.

The '370 patent also describes that a random placement pattern may be used throughout the length and/or width of the panel, and it gives examples of how to create those random placement patterns: "a random placement pattern of the deformities may be utilized throughout the length and/or width of the panel members. The deformities may have shapes or a pattern with no specific angles to reduce moire or other interference effects. Examples of methods to create these random patterns are printing a pattern of shapes using stochastic print pattern techniques, frequency modulated half tone patterns, or random dot half tones." *Id.* at 5:44-52.

The '370 patent further describes additional kinds of deformities, using the deformities in Figs. 4b-d (reproduced above) as examples: "other light extracting deformities including prismatic surfaces, depressions or raised surfaces of various shapes using more complex shapes in a mold pattern may be molded, etched, stamped, thermoformed, hot stamped or the like into or on one or more areas of the panel member. Figures 4b and 4c show panel areas 22 on which prismatic surfaces 23 or depressions 24 are formed in the panel areas, whereas Figure 4d shows

6

Case IPR2015-01867
Patent 7,537,370

prismatic or other reflective or refractive surfaces 25 formed on the exterior of the panel area. The prismatic surfaces, depressions or raised surfaces will cause a portion of the light rays contacted thereby to be emitted from the panel member." *Id.* at 5:58 through 6:2. The written description also provides examples of how those deformities can vary: "the angles of the prisms, depressions or other surfaces may be varied to direct the light in different directions to produce a desired light output distribution or effect. Moreover, the reflective or refractive surfaces may have shapes or a pattern with no specific angles to reduce moire or other interference effects." *Id.* at 6:2-7.

The '370 patent discusses a sheet or film used in the panel assemblies: "[t]his sheet or film may become a permanent part of the light panel assembly for example by attaching or otherwise positioning the sheet or film against one or both sides of the panel member similar to the sheet or film 27 shown in FIGS. 3 and 5 in order to produce a desired effect." *Id.* at 4:56-61.

The '370 patents provides an example of a sheet or film in its description of Fig. 5: "[m]oreover, a transparent film, sheet or plate 27 may be attached or positioned against the side or sides of the panel member from which light is emitted using a suitable adhesive 28 or other method in order to produce a desired effect.

7

Case IPR2015-01867
Patent 7,537,370

The member 27 may be used to further improve the uniformity of the light output distribution. For example, the member 27 may be a colored film, a diffuser, or a label or display, a portion of which may be a transparent overlay that may be colored and/or have text or an image thereon." Ex. 1001 at 6:20-29.



## II.    ARGUMENT

Petitioner must show a "reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a). Petitioner does not pass that threshold because (1) the Petition is time-barred and (2) none of the grounds in the Petition presents a reasonably likelihood of Petitioner prevailing.

### A. The Petition is time barred

The Board should deny the Petition because it is time-barred under 35 USC § 315(b) ("An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent.") (emphasis added). Petitioner is in privity with LG Electronics, Inc.;

8

Case IPR2015-01867
Patent 7,537,370

LG Electronics U.S.A., Inc. ("LGE USA"); LG Display Co., Ltd.; and LG Display America, Inc. ("LGD USA") (collectively, "LG"). Furthermore, LG is a real party-in-interest to this proceeding. Accordingly, this Petition is subject to § 315(b) time-bar.

On December 31, 2013, Patent Owner filed a lawsuit against LG alleging infringement of the '370 patent. *Delaware Display Group LLC, et al. v. LG Electronics, Inc., et al.*, No. 1:13-cv-02109 (D. Del., filed Dec. 31, 2013) (the "Delaware Lawsuit"). On January 2, 2014, Patent Owner served LGE USA and LGD USA with the summons in the Delaware Lawsuit. *See* Delaware Lawsuit, D.I. 6 and 7 (Exs. 2003 and 2004). That lawsuit remains pending in Delaware, having progressed past claim construction and with discovery almost closed.

On July 1, 2014, LG Display Co., Ltd. filed an IPR against the '370 patent (IPR2014-01096), naming LGD USA as its real party-in-interest. *See* IPR2014-01096, Paper 2, at 1. On January 13, 2015, the Board instituted that IPR, but only for two claims. The Board refused to institute that IPR for any of the asserted claims in the Delaware Lawsuit.

On December 29, 2014 (only a few days before the one-year deadline), LG Electronics, Inc. filed an IPR against the '370 patent (IPR2015-00493), naming LGE USA as its real party-in-interest. *See* IPR2015-00493, Paper 2, at 1. On July 15,

9

Case IPR2015-01867
Patent 7,537,370

2015, the Board instituted that IPR, but only for the same two claims as before, neither of which are asserted in the Delaware Lawsuit.

On January 2, 2015, the deadline for LG to file IPRs passed. Now, almost a year later, Patent Owner is faced with this IPR, brought by one of LG's suppliers. LG's IPRs were the only pending IPRs against the '370 patent. Thus, none of the asserted claims in the Delaware Lawsuit were subject to a pending IPR until Petitioner filed this IPR.

In total, LG has filed 19 IPR petitions against the patent-at-issue and its related patents. *See* IPR2014-01092; -01094; -01095; -01096; -01097; -01357; -01359; -01362; IPR2015 -00487; -00489; -00490; -00492; -00493; -00495; -00496; -00497; -00506; -01666; and -01717.

But, as noted above, the Board denied LG's IPRs against the '370 patent (IPR2014-01096 & IPR2015-00493) for the asserted claims in the Delaware Lawsuit. Moreover, the Board denied LG's IPRs against two other related patents asserted in the Delaware Lawsuit against LG: U.S. Patent Nos. 8,215,816 (the "'816 patent" (IPR2014-01095 & IPR2015-00496)) and 7,434,974 the ("'974 patent" (IPR2014-01092 and IPR2015-00497)).

While there were pending IPRs for half of the other asserted patents in the Delaware Lawsuit, there were no pending IPRs for the asserted claims of the '974, '370, and '816 patents. Without any IPRs pending for those patents, LG's chances

10

Case IPR2015-01867
Patent 7,537,370

of obtaining a stay of the Delaware Lawsuit were slim. But just a month before the hearing on LG's motion to stay, Petitioner filed three IPR petitions coinciding exactly with and only for the three patents in the Delaware Lawsuit without pending IPRs, which included the instant Petition. *See* IPR2015-01866 ('816 Patent); IPR2015-01867 ('974 Patent); IPR2015-01868 ('370 Patent) (collectively the "KJ Pretech IPRs"). Importantly, Petitioner admits that it supplies backlight units to LG (Paper 9, at 2), and those backlight units contain some of the components that meet the limitations of the asserted patents, *e.g.*, the "optical panel member," and "at least one film, sheet or substrate" of claim 1 of the '370 patent.

This Petition was filed so that LG could represent to the Delaware district court that all of the asserted claims in the Delaware Lawsuit are subject to a pending IPR petition. *See* Defendant's Stay Hearing Presentation ("LG Stay Presentation"), Ex. 2002, at 2. In fact, LG emphasized the KJ Pretech IPRs in its argument for stay. *See id.* at 5. It is no coincidence that the Petitioner's filings neatly fill the gaps of the claims and patents asserted in the Delaware Lawsuit that were left uncovered when LG's IPR petitions were denied.

Those facts indicate that Petitioner filed this IPR at the behest of LG, and thus LG is an unnamed real party-in-interest to this Petition. *See* Trial Practice Guide at 48,759. The real party-in interest and privies requirement "seeks to protect patent owners from harassment via successive petitions by the same or related parties, to

11

Case IPR2015-01867
Patent 7,537,370

prevent parties from having a 'second bite at the apple,' and to protect the integrity of both the USPTO and Federal Courts by assuring that all issues are promptly raised and vetted." *Id.* This is a case of harassment via successive petitions by related parties. With LG's virtually limitless set of suppliers, there is a potential for endless serial IPRs against this patent. Indeed, during the meet and confer on LG's stay motion, LG refused to agree that it would not seek further stays based on yet-to-be filed IPRs, even though at that point LG was time-barred from filing any more IPRs. *See* Delaware Lawsuit, D.I. 41, at 7 (Ex. 2005).

At the very least, LG is a privy to Petitioner because it has the opportunity to control Petitioner. *See* Trial Practice Guide at 48,759. LG is a major customer of Petitioner for the components that Patent Owner has accused of infringement in the Delaware Lawsuit. Moreover, Petitioner admits that a supply agreement exists between itself and LG. *See* Paper 9, at *1. Petitioner shares counsel with LG for both LG's IPRs and LG's representation in the Delaware Lawsuit. And Petitioner filed this IPR for the purpose of buttressing LG's motion for stay in the Delaware Lawsuit. Under these circumstances, allowing this Petition to proceed would be to countenance LG's clear abuse of the IPR system and continued harassment of Patent Owner.

Case IPR2015-01867
Patent 7,537,370

### B. *None of the grounds in the Petition presents a reasonable likelihood of Petitioner prevailing*

#### 1. Ground 1 contains the same prior art and substantially the same arguments that the Board previously rejected

In Ground 1, Petitioner alleges that the Kobayashi reference renders claims 1, 4, and 29 obvious. LG used Kobayashi for an anticipation ground in IPR2014-01096 (the "LG Petition") against the '370 patent, but the Board refused to institute that ground. *See* Petition at 11-12 (Petitioner admitting the same). That denial covered all the same claims (claims 1, 4, and 29) that Petitioner challenges here in Ground 1. Discussing Kobayashi, the Board previously found that "Petitioner does not explain how the spot-shaped reflecting layers, produced by white paint or aluminum vapor deposition, qualify as 'projections or depressions." Ex. 1027, IPR2014-01096, Paper 11, at *14. Petitioner points to the difference between its Petition and the LG Petition as by stating that "Petitioner relies on 'a satin finish 24 which comprises minute depressions having multiple shapes such as concavity or hemisphere' from Fig. 5 of Kobayashi, rather that the 'array of spot-shaped reflecting layers 22' from Fig. 2." Petition at 12.

Under these circumstances, where the Board has already considered the <u>same prior art</u>, the Director may reject the Petition. *See* 35 U.S.C. § 325(d) ("In determining whether to institute or order a proceeding . . . the Director may take into account whether, and reject the petition or request because, the same or substantially

13

Case IPR2015-01867
Patent 7,537,370

the same prior art or arguments previously were presented to the Office.").

Moreover, when the Board has already considered <u>substantially the same arguments,</u>

it may reject a Petition. *Id.* Patent Owner asks the Board to exercise that discretion

to deny institution of Ground 1 for Petitioner's use of (1) the same prior art and/or

(2) substantially the same arguments.

## 2. Ground 2 contains the same or substantially the same arguments that previously were rejected by the Board

In Ground 2, Petitioner challenges claims 13 and 47 as obvious over the

combination of Kobayashi and Pristash. But Petitioner admits that the Board has

already denied review of claims 13 and 47 in IPR2014-01096 ("LG Petition") based

on the combination of Kobayashi and Pristash. *See* Petition at 25-26. The only

substantive difference between Ground 2 and the previously denied ground is the

same difference discussed above with respect to Ground 1. *Id.* Thus, Ground 2 is

also comprised of "the same or substantially the same prior art or arguments

previously presented" to the Board. As before, Patent Owner asks the Board to

exercise its discretion under 35 U.S.C. § 325(d) to deny institution of this ground

that because it relies on (1) the same prior art and/or (2) substantially the same

arguments as previously presented to the Board.

14

Case IPR2015-01867
Patent 7,537,370

### 3. Ground 2 – Kobayashi in view of Pristash does not teach or suggest elements [13.f] or [47.f]

Claims 13 and 47 require that "the panel member has a *transition region between the at least one input edge and the patterns of light extracting deformities* to allow the light from the at least one light source to mix and spread," which is identified as elements [13.f] and [47.f] by the Petitioner.

The entirety of Petitioner's argument regarding this element consists of one unsupported sentence: "Pristash, however, discloses transition device 5 between the input edge 10 and disruptions 16." Petition at 26. However, "transition device 5" is not a "transition region between the at least *one input edge* and the *patterns of light extracting deformities*" as required by the claim. Instead, transition device 5 "is used to make the transition *from the light source 3 target shape to the light emitting panel input edge 4*." Ex. 1007 at 3:2-4 (emphasis added). The stretch that Petitioner makes is shown in annotated Fig. 1 from Pristash below. The immediately preceding citation from Pristash describes that the transition device is between the elements 10 and 4, as shown by the red arrow. Petitioner adds the area shown by the green arrow (ending where disruptions 16 begin) to the purported transition region of Pristash even though it is outside the bounds of transition device 5.

15

Case IPR2015-01867
Patent 7,537,370



FIG. I

Moreover, Petitioner incorrectly identifies Pristash's "input end 10" as the "input edge" on the panel member in its Petition. *See* Petition at 26. But Pristash shows this as the "input end 10 *of the transition device 5.*" Ex. 1007 at 3:19-20 (emphasis added). In contrast, claims 13 and 47 require that the "input edge" must be a part of the "optical panel member," not the "transition region." *See, e.g.,* '370 patent at claim 13 (stating, "an optical panel member having at least one input edge . . . wherein the panel member has a transition region between the input edge and the patterns of light extracting deformities"). Even Petitioner's expert's annotated Figure 1 demonstrates that the "transition device" of Pristash is not between the "input edge of the light emitting panel" and the "pattern of deformities." Mr. Credelle calls element 4 the "input edge of the light emitting panel," not element 10.

16



Ex. 1004 at ¶ 116.

Further, Petitioner admits that Kobayashi does not disclose the claimed transition region. *See, e.g.,* Petition at 26 ("Regarding claim element [13.f], the claimed transition region is not explicitly recited in Kobayashi."). Thus, Ground 2 relies solely on Pristash to purportedly meet the transition region requirement of these claims. Accordingly, Kobayashi in view of Pristash does not teach or suggest elements [13.f] and [47.f], and the Board should deny institution of Ground 2.

### 4. Grounds 3, 4, and 5 – Petitioner did not supply a full translation of Suzuki

The English translation of Suzuki provided by Petitioner does not satisfy the requirements of the Board. Specifically, Petitioner did not provide a full translation of Suzuki and thus the Board cannot rely upon it. *See* Trial Practice Guide at 48,761

17

Case IPR2015-01867
Patent 7,537,370

("All proceedings before the Board will be conducted in English. Translations therefore must be provided for … all documents relied on, or otherwise used, during the proceedings. Unless accompanied by an English language translation, such documents in a language other than English will not be considered by the Board.") Patent Owner notes that a comparison of the original to the English translation shows that the translation has portions omitted or changed. For example, it appears that at least the titles of Figs. 6-20 have been omitted from the translation, although it is unclear if any of the titles have been translated because the actual figures appear nowhere in the translation. *See* Ex. 1008 (showing no figures); *cf.* Ex. 1009 (showing 20 figures). Moreover, three inventors (shown by three circles 72) are translated as "Inventor: SUZUKI et al." and circle 54 is untranslated. *See* Ex. 1009 at 1 (showing circle 54); *cf.* Ex. 1008 (not showing circle 54).

### 5.  Ground 3 – Suzuki does not teach or suggest claim elements [1.e] or [13.e]

Independent claims 1 and 13 recite "at least some of the light extracting deformities on or in **one of the sides are of a different type** than the light extracting deformities on or in the other side of the panel member." These limitations are annotated as elements [1.e] and [13.e] in the Petition. *See* Petition at 45, 48. Petitioner identifies different types of deformities, but all of these patterns $2_1$ are only shown on one side of the light guide 2. *See* Ex. 1009 at Fig. 1(B). Suzuki does not disclose putting deformities on both sides of the light guide where those

18

Case IPR2015-01867
Patent 7,537,370

deformities are of a different type. Table 1 of Suzuki shows that where it uses an embossed pattern on both sides of the light guide, the pattern is of the same type.

Table 1

| | | Example | | Comparative Example | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 1 | 2 | 3 | 4 | 5 | 6 |
| Light Guide Layer Thickness (mm) | | 4 | 5 | 4 | 5 | 4 | 4 | 4 | 4 |
| Embossed Pattern | Type | Quadrangular Pyramid | Quadrangular Pyramid | No | Hairline | Quadrangular Pyramid | Quadrangular Pyramid | Quadrangular Pyramid | Quadrangular Pyramid |
| | Pitch (mm) | 0.5 | 0.5 | - | 0.5 | 0.05 | 2 | 0.5 | 0.5 |
| | Angle of Oblique Surfaces (°) | 45 | 45 | - | 45 | 45 | 45 | 18 | 85 |
| | Surface Direction | Single Side | Both Sides | - | Both Sides | Both Sides | Single Side | Both Sides | Both Sides |
| * Brightness (nit) | | 600 | 650 | 150 | 400 | 470 | 400 | 420 | 440 |

*Brightness in a central region of the light emission surface, where the distance from the light source is maximum and the brightness is minimum.

### 6. Ground 3 -- Suzuki does not teach or suggest claim elements [29.e] or [47.e]

Independent claims 29 and 47 require "at least some of the light extracting deformities on or in **one of the sides vary in a different way or manner** than the light extracting deformities on or in the other side of the panel member." None of Petitioner's citations support the argument that Suzuki discloses this limitation. For example, Petitioner's purported support from Suzuki for this limitation includes the following: "Embossed patterns having different pitches may be formed on the front and back surfaces of the transparent light guide layer." Petition at 49. But differing only in "pitch" would not allow for varying in a different way or manner between the front and back side. And none of the other citations in the Petition even address the front and back sides of the light guide of Suzuki. *Id.* Accordingly, Suzuki does

19

Case IPR2015-01867
Patent 7,537,370

not teach or suggest that a pattern from one side varies differently than a pattern from the other side of the light guide.

### 7. Ground 3 -- Suzuki does not teach or suggest claim elements [13.f], [13.g], [47.f], or [47.g]

Independent claims 13 and 47 require that [13.f]/[47.f] "the panel member has a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread, and" [13.g]/[47.g] "at least one side of the transition region contains optical elements for reflecting or refracting light from the at least one light source."

Petitioner cites one sentence in Suzuki as disclosing both sets of limitations, [13.f]/[13.g] and [47.f]/[47.g]: "The region in which the pattern is formed is not limited to the entire area of the light emitting surface, and the pattern may instead be formed only in a region where the function of a light source is to be provided." Petition at 48 (citing Suzuki at 19); *id.* at 51 (citing the same). But, according to that citation, one of ordinary skill in the art would not have used the disclosed "pattern" in a transition region because the transition region of the claims of the '370 patent is not defined as "an area where the function of a light source is to be provided." Instead, as proposed by Petitioner, the function of the transition region of the '370 patent is "to allow the light from the at least one light source to mix and spread." Petition at 8. Thus one of ordinary skill would not have placed the pattern of Suzuki there.

20

Case IPR2015-01867
Patent 7,537,370

### 8. Ground 4 -- Suzuki in view of Pristash does not teach or suggest elements [13.f], [13.g], [47.f], or [47.g]

For these limitations, Petitioner uses Pristash alone for allegedly disclosing the transition device. Thus, this ground fails for the same reasons discussed relating to Ground 2, explaining that Pristash does not disclose a transition region.

### 9. Ground 4 – Suzuki and Pristash are not combinable.

Combining Suzuki and Pristash in the manner suggested by Petitioner ignores the *Graham* factors. As confirmed by the Supreme Court in *KSR*, an obviousness analysis begins with a consideration of the *Graham* factors. *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 406-407 (2007) (citing *Graham v. John Deere Co.*, 383 U.S. 1 (1966)). The *Graham* factors are as follows:

(A) Determining the scope and content of the prior art;

(B) Ascertaining the differences between the claimed invention

and the prior art; and

(C) Resolving the level of ordinary skill in the pertinent art.

*Graham*, 383 U.S. at 17-18.

In considering the *Graham* factors, both the claimed invention and the scope and content of the prior art must be considered as a whole, including disclosures in the references that diverge from and teach away from the invention at hand. *See W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984). It is improper to limit the obviousness inquiry to merely

21

Case IPR2015-01867
Patent 7,537,370

identifying a difference from the prior art and then contending that that difference alone would have been obvious. *See Schenck v. Nortron Corp.*, 713 F.2d 782 (Fed. Cir. 1983); Ab*bott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1348 (Fed. Cir. 2008) ("in addressing the question of obviousness a judge must not pick and choose isolated elements from the prior art and combine them so as to yield the invention in question if such a combination would not have been obvious at the time of the invention.") (citing *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810 (1986)).

Petitioner did not consider Suzuki and Pristash as a whole, otherwise Petitioner would have found that the combination of the two would have led to system with *increased* light loss – a result that is opposed to the goals of the '370 patent (*See, e.g.*, Ex. 1001 at 1:41-42; 1:65 through 2:1). Petitioner argues that if Suzuki were modified to have a point-source light, one having skill in the art would have been motivated to use Pristash's transition device. *See* Petition at 55. But one of ordinary skill would not have wanted to use the suggested transition device because the converging lens of Pristash would **decrease** optical coupling in that proposed combination, causing more loss. Because Petitioner failed to address the negative ramifications of making that suggested modification, Petitioner has not shown Suzuki and Pristash are properly combinable.

22

Case IPR2015-01867
Patent 7,537,370

### 10.  Ground 5 – Suzuki and Murata are not combinable

In this Ground, Petitioner relies on Suzuki to satisfy every claim element of claims 1, 4, 5, 9, and 13 except the requirement that "at least some of the light extracting deformities on or in **one of the sides vary in a different way or manner** than the light extracting deformities on or in the other side of the panel member," which is identified as elements [1.e] and [13.e].

Murata is a tail light for a car. "The present invention relates to a lamp having light emitting diodes as light source, and suited for use as an automobile lamp, a room lamp of hotel or house, a night signal, especially a tail lamp of an automobile." Ex. 1011 at 1:6-10. Petitioner fails to explain why one of ordinary skill in the art would look to a tail light patent to modify the backlight of Suzuki. Moreover, Murata does not contain a light guide, even though Petitioner improperly refers to the reflector 6 as a light guide. Petition at 56; *cf.* Ex. 1011 at 5:60-68. *Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 759 (Fed. Cir. 2015) ("Such a change in a reference's 'principle of operation' is unlikely to motivate a person of ordinary skill to pursue a combination with that reference.").

Murata and Suzuki are also much different in size. Murata explains the lamp of its invention can be made "so thin," *e.g.*, "20 to about 60 mm." *See* Ex. 1011 at 2:39-41. In contrast, Suzuki is about 4 to 5 mm thick. *See* Suzuki at 8. In fact, Suzuki teaches away from increasing the thickness of the light guide:

23

Case IPR2015-01867
Patent 7,537,370

Also, it is necessary to **increase the thickness** of the transparent light guide layer by a considerably large amount to achieve the surface brightness required of the surface light source device, and there is a problem in that requirements for reduction in size and eight of the device cannot be satisfied.

The present invention has been made to **solve the above-described problems** of the related art, and an object of the present invention is to provide an inexpensive surface light source device which includes **an extremely thin transparent light guide layer** . . .

*Id.* at 5.

Petitioner does not explain why one of ordinary skill would have combined Murata and Suzuki in spite of all of those differences. Thus, Petitioner has not met its burden to show that it considered Murata and Suzuki as whole, and still deemed them combinable. Accordingly, Petitioner has not carried its weight to show that Murata and Suzuki render these claims obvious.

## III.    CONCLUSION

Because Petitioner fails to show that all elements of the '370 patent claims are disclosed in the cited prior art and provides no credible motivation for combining the teachings of the cited prior art in the proposed manner, Petitioner fails to establish that there is a reasonable likelihood that they would prevail with respect to any claim of the '370 patent. As such, Petitioner's request for *inter partes* review should be denied.

24

Case IPR2015-01867
Patent 7,537,370

Dated: December 22, 2015                    Respectfully submitted,


_____
Justin B. Kimble

Attorney for Patent Owner
Registration No. 58,591
Bragalone Conroy PC
2200 Ross Ave.
Suite 4500 – West
Dallas, TX 75201

25

Case IPR2015-01867
Patent 7,537,370

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that document has been served via electronic mail on December 22, 2015, to Petitioner at following email addresses pursuant to its consent in its Petition at p. 3: rpluta@mayerbrown.com; bpaul@mayerbrown.com; astreff@mayerbrown.com; alam@mayerbrown.com; and PretechIPR@mayerbrown.com.

_____
Justin B. Kimble

Attorney for Patent Owner
Registration No. 58,591
Bragalone Conroy PC
2200 Ross Ave.
Suite 4500 – West
Dallas, TX 75201

26

# EXHIBIT M

Trials@uspto.gov
571-272-7822

Paper No. 15
March 17, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

K.J. PRETECH CO., LTD,
Petitioner,

v.

INNOVATIVE DISPLAY TECHNOLOGIES LLC,
Patent Owner.

————————

Case IPR2015-01867
Patent 7,537,370

————————

Before THOMAS L. GIANNETTI, MIRIAM L. QUINN, and
BEVERLY M. BUNTING, *Administrative Patent Judges*.

GIANNETTI, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2015-01867
Patent 7,537,370

K.J. Pretech Co., Ltd. ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1, 4, 5, 9, 13, 29, and 47 of U.S. Patent No. 7,537,370 ("the '370 patent").  Paper 2 ("Pet.").  Innovative Display Technologies LLC ("Patent Owner") filed a Preliminary Response.  Paper 11 ("Prelim. Resp.").  Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we the institute an *inter partes* review of claims 29 and 47. We decline to institute a review as to the other claims challenged.


## I.  BACKGROUND

### A.  *The '370 patent (Ex. 1001)*

The '370 patent is titled "Light Emitting Panel Assemblies."  The Abstract describes the subject matter as follows:

> Light emitting panel assemblies include an optical panel member having a pattern of light extracting deformities on or in one or both sides to cause light to be emitted in a predetermined output distribution.  The pattern of light extracting deformities on or in one side may have two or more different types or shapes of deformities and at least one of the types or shapes may vary along the length or width of the panel member. Where the light extracting deformities are on or in both sides, at least some of the deformities on or in one side may be of a different type or shape or vary in a different way or manner than the deformities on or in the other side.

Ex. 1001, Abstract.

2

Case IPR2015-01867
Patent 7,537,370

### B.  Illustrative Claim(s)

Claim 1 is illustrative of the claims at issue:

> 1. A light emitting panel assembly comprising
> at least one light source,
> an optical panel member having at least one input edge
> for receiving light from the at least one light source, the panel
> member having front and back sides and a greater cross
> sectional width than thickness,
> both the front and back sides having a pattern of light
> extracting deformities that are projections or depressions on or
> in the sides to cause light to be emitted from the panel member
> in a predetermined output distribution,
> where the pattern of light extracting deformities on or in
> at least one of the sides varies along at least one of the length
> and width of the panel member and
> at least some of the light extracting deformities on or in
> one of the sides are of a different type than the light extracting
> deformities on or in the other side of the panel member, and
> at least one film, sheet or substrate overlying at least a
> portion of one of the sides of the panel member to change the
> output distribution of the emitted light such that the light will
> pass through a liquid crystal display with low loss.

### C.  Related Proceedings

Patent Owner identifies numerous proceedings in which it has alleged
infringement of the '370 patent.  *See* Paper 5 for a listing.  In addition,
Patent Owner identifies several other petitions requesting *inter partes* review
of the '370 patent and related patents.  *Id.*  In IPR2014-01096 ("IPR-1096"),
one such petition was granted as to claims 15 and 27 of the '370 patent, and
an *inter partes* review was instituted by the Board as to those claims on
January 13, 2015.  Ex. 1027.  A second petition, in IPR2015-00493, relied
on the same prior art as the petition in IPR-1096, and was granted by the
Board.  The Board also granted the petitioner's motion for joinder of that

3

Case IPR2015-01867
Patent 7,537,370

proceeding with IPR2014-01096. A Final Written Decision determining that claims 15 and 27 are unpatentable was entered by the Board on December 18, 2015. IPR-1096, Paper 40.

### D. Claim Construction

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

As Petitioner points out, however, the '370 patent expired on June 27, 2015. Pet. 6. For expired patents, we apply the claim construction standard set forth in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005). *Id.*

### 1. "deformities"

The first claim term for which Petitioner proposes a construction is the term "deformities," appearing in all challenged claims. Petitioner asserts that the '370 patent "expressly defines" this term to mean "any change in the shape or geometry of a surface and/or coating or surface treatment that causes a portion of light to be emitted." Pet. 7 (citing Ex, 1001, col. 4, ll. 36–40).[1] Patent Owner's preliminary response takes no position on claim construction.

The same construction was used in IPR-1096. We have considered Petitioner's construction of "deformities" and determined that at this stage it should be adopted here, also.

---

[1] The supporting citation in the Petition (Ex. 1001, col. 6, ll. 6–10) is incorrect.

4

Case IPR2015-01867
Patent 7,537,370

### 2. "transition region"

This term appears in challenged claims 13 and 47.  Petitioner submits that the term "a transition region between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread" should at least include any "region configured to transmit light [between the at least one input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread]." *Id.* at 8.  We discuss this further in connection with our consideration of claim 47, *infra*.

### E. References

Petitioner relies on the following references:[2]

| Kobayashi | US 5,408,388 | Apr. 18, 1995 | Ex. 1006 |
| Pristash | US 5,005,108 | Apr. 2, 1991 | Ex. 1007 |
| Suzuki | JP H03-189679 | Aug. 19, 1991 | Ex. 1008[3] |
| Murata | US 4,929,866 | May 29, 1990 | Ex. 1011 |

Petitioner also states that it is relying on Admitted Prior Art ("APA") from the '370 patent specification.  Pet. 9 (citing Ex. 1001, col. 2, ll. 58–65).  Petitioner also relies on a Declaration from Thomas L. Credelle ("Credelle Decl.").  Ex. 1004.

### F. Grounds Asserted

Petitioner challenges claims 1, 4, 5, 9, 13, 29, and 47 of the '370 patent under 35 U.S.C. § 103(a) on the following grounds

| Reference(s) | Claims Challenged |
| --- | --- |
| Kobayashi | 1, 4, and 29 |

---

[2] The references are ordered by exhibit number with effective dates asserted by Petitioner.

[3] Exhibit 1008 is the English translation of the Suzuki Japanese publication (Ex. 1009).

Case IPR2015-01867
Patent 7,537,370

| Kobayashi and Pristash | 13 and 47 |
| Suzuki | 1, 4, 5, 9, 13, 29, and 47 |
| Suzuki and Pristash | 13 and 47 |
| Suzuki and Murata | 1, 4, 5, 9, and 13 |

## II.  ANALYSIS

### A.  Asserted Grounds Based On Kobayashi

### (Claims 1, 4, and 29)

Petitioner contends that these claims are obvious over Kobayashi under 35 U.S.C. § 103(a).  Pet. 11–25.  For the reasons that follow, we are not persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on this ground.

### 1.  Kobayashi Overview

This patent describes a planar illuminating device used as a backlight for liquid crystal displays.  Ex. 1006, col.1, ll. 6–9.  The device has a rectangular light transmitting plate of a transparent material.  *Id*. at col. 4, ll. 10–11.  One side of the plate has prismatic cuts.  *Id*. at col. 4, l. 27.  The other side has a reflecting finish, e.g., an array of spot-shaped light reflecting layers.  *Id*. at col. 4, ll. 28–29.  This is illustrated by Figure 2 of Kobayashi, reproduced here:

6

Case IPR2015-01867
Patent 7,537,370

## FIG. 2



In Figure 2 above, light plate 2, fluorescent lamps 3, and array of spot-shaped reflective layers 22 (e.g., of white paint or aluminum vapor deposition) are shown.  *Id*. at col. 4, ll. 45–47.

2.  Discussion

Petitioner recognizes that Kobayashi was considered by the Board in IPR-1096.  Pet. 11–12.  There, the petitioner relied on the prismatic cuts and array of spot-shaped light reflecting layers in Kobayashi to satisfy the "deformities" limitation recited in the claims.  In denying petitioner's request to institute trial, the Board observed that,

> The language of the claims . . . specifies "a pattern of light extracting deformities that are projections or depressions." Petitioner does not explain how the spot-shaped reflecting layers, produced by white paint or aluminum vapor deposition, qualify as "projections or depressions."

Ex. 1027, 14.  The present Petition relies on different embodiments disclosed in Kobayashi, illustrated in Figures 5 and 6 reproduced below:

7

Case IPR2015-01867
Patent 7,537,370

FIG. 5



FIG. 6



As described in Kobayashi, Figure 5 illustrates a main part of a planar illuminating device. *Id.* at col. 6, ll. 27–27. Kobayashi describes the entire rear portion of light transmitting plate 2 as having "a satin finish 24 which comprises minute depressions having suitable shapes such as a concavity or a hemisphere." *Id.* at col. 6, ll. 30–33. Satin finish 24 also has a "large number of spot-shaped layers 25," which are made of a transparent paint of substantially the same index of refraction as light transmitting plate 2 and applied to the satin finish. *Id.* at col. 6, ll. 30–37. Each spot-shaped layer 25

8

Case IPR2015-01867
Patent 7,537,370

"fully fills" depressions of the satin finish 24. Rear surfaces 25a of spot-shaped layers 25 are described as "flat." *Id.* at col. 6, ll. 37–40.

As further described in Kobayashi, in the Figure 6 embodiment, light transmitting plate 7 has a rear portion comprising two portions 7a, 7a, tapering in thickness moving away from both sources of light 3, 3. Ex. 1008, col. 7, ll. 1–12. The front portion of light transmitting plate 7 has prismatic cuts 21 or hairline finish 23. The rear portion has a reflecting finish of an array of reflecting spots 22 or of a combination of satin finish 24 and assembly of spot-shaped layers 25. *Id.* at col. 7, ll. 12–17.

Petitioner also relies on the Figure 6 embodiment of Kobayashi. Pet. 12. Specifically, Petitioner relies on Kobayashi's disclosure of "minute depressions" to meet the requirement of these claims calling for "deformities that are projections or depressions on or in the sides to cause light to be emitted from the panel member in a predetermined output distribution." *Id.* at 13–15. The Petition (at page 15) includes an annotated version of Kobayashi's Figure 6 in which the depressions in satin finish 24 and spot-shaped layers 25 are identified as meeting this element. To the same effect are the claim charts at pages 20–22 of the Petition.

Patent Owner responds that the same prior art and substantially the same arguments were considered and rejected by the Board in IPR-1096. Prelim. Resp. 13. We agree. In IPR-1096, in denying the petitioner's motion for rehearing, we relied on the dictionary definition of a layer as "'[a] single thickness, coating, or stratum spread out or covering a surface.' *The American Heritage Dictionary* 742 (1975)." We also cited a definition of a projection as: "'Something that thrusts outward; a protuberance.' *Id.* at 1046." IPR-1096, Paper 21, 4.

9

Case IPR2015-01867
Patent 7,537,370

In this proceeding, we are not persuaded that the spot-shaped layers in the Figure 6 embodiment of Kobayashi are projections or depressions. According to Kobayashi, the rear surfaces of the spot-shaped layers are "flat." Ex. 1006, col. 6, ll. 39–40. Moreover, each spot–shaped layer "fully fills" depressions of the satin finish. *Id.* at col. 6, ll. 37–39. Petitioner has not pointed to any part of Kobayashi that describes such a spot-shaped layer as either a projection or a depression. We, therefore, determine that on this record, Petitioner has not persuaded us that that the spot-shaped layers are projections or depressions.

Likewise, we are not persuaded that the "minute" depressions in the satin surface meet this requirement of the claims. The claims require that the projections or depressions "cause light to be emitted from the panel member in a predetermined output distribution." As described by Kobayashi, the desired effect of uniform surface illumination is achieved through varying "the occupation ratio between part of the satin finish having no spot-shaped layer 25 and part of the satin finish having a spot-shaped layer 25." *Id.* at col. 6, ll. 62–68. Thus, it is the placement of the spot-shaped layers, which are neither projections nor depressions, and not the satin finish, with its "minute depressions," that achieves the desired output distribution.

Finally, we note that Kobayashi also describes the surface of the panel as "satin," indicating that it is smooth, and further describes the depressions as "minute." Petitioner has not argued that Kobayashi's drawings are made to scale. Thus we are not persuaded to base our decision on the appearance of the depressions in Figures 5 and 6, including their relative size in those

10

Case IPR2015-01867
Patent 7,537,370

figures. *See Nystrom v. TREX Co., Inc.,* 424 F.3d 1136, 1149 (Fed. Cir. 2005)(patent drawings do not define the precise proportion of the elements).

In summary, we agree with Patent Owner that Petitioner has not demonstrated a reasonable likelihood of prevailing in proving that claims 1, 4, and 29 would have been obvious over Kobayashi.

### B. Asserted Ground Based On Kobayashi and Pristash
### (Claims 13 and 47)

Petitioner's reliance on Pristash is confined to the "transition region" limitation of these claims, and not the claim limitation discussed above that is missing from Kobayashi. Pet. 25–33. In view of this, for the foregoing reasons, we decline to institute a trial on Petitioner's challenge to claims 13 and 47 based on Kobayashi and Pristash.

### C. Asserted Grounds Based On Suzuki
### (Claims 1, 4, 5, 9, 13, 29, and 47)

Petitioner's analysis of these claim in relation to Suzuki appears at pages 33–52 of the Petition. Petitioner asserts that Suzuki discloses "each and every limitation" of independent claim 1. Pet. 34. Petitioner makes a similar assertion for independent claims 13, 29, and 47. *Id.* at 39 (claim 13), 41 (claim 29), and 42 (claim 47). For the reasons that follow, we are not persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on this ground as to claims 1, 4, 5, 9, and 13. On this record, we are persuaded that Petitioner has a reasonable likelihood of prevailing on this ground as to claims 29 and 47.

1. Suzuki Overview

Suzuki describes a surface light source device that includes an extremely thin transparent light guide layer. Suzuki's stated objective for

11

Case IPR2015-01867
Patent 7,537,370

this device is to emit light with a brightness that is equivalent to or higher than that of light emitted by a structure of the related art, which can be reduced in size and weight, and which has a simple structure that can be easily manufactured.  Ex. 1008, 5.  Several embodiments are disclosed. Figures 1 and 2 of Suzuki are reproduced here:



Ex. 1008, 7.  Figure 1 shows light diffusion layer 1 arranged to extend over the entire area between tubular light sources 4, 4.  Figure 1 also shows that transparent light guide layer 2 and reflective layer 3 are successively stacked below the light diffusion layer 1.  In this embodiment, the transparent light guide layer 2 was produced by forming an embossed pattern 21 on both

12

Case IPR2015-01867
Patent 7,537,370

sides of acrylic resin plates over the entire area thereof. *Id.* at 8. Other embodiments show an embossed pattern on one side of the transparent light guide. *Id.* at 16.

In Figure 2A, the embossed pattern 21 is shown as a pattern of quadrangular-pyramid-shaped recesses formed at a pitch of 0.5 mm and having oblique surfaces at an angle of 45°. *Id.* at 8. Alternative patterns are described in the disclosure, including triangular pyramids, conical shapes, and mountain and valley shapes. *Id.* at 13. As described, the pyramids may be either projections or depressions. *Id.* Suzuki also describes varying the surface angles and the pitch of the embossed patterns. *Id.* at 13–14.

Suzuki presents a series of "studies" based on the embossed pattern shown in Figure 2A *supra*. *Id.* at 8. The results appear in Table 1. *Id.* at 9.

2. Claims 1, 4, 5, 9, and 13

These claims call for a a light emitting panel having light extracting deformities on both front and back sides. According to claim 1, "at least some of the light extracting deformities on or in one of the sides are of a different type than the light extracting deformities on or in the other side of the panel member." The other claims in this group contain the same limitation.

Petitioner asserts that Suzuki meets this limitation. Pet. 35–38. Specifically, Petitioner asserts that Suzuki discloses "various types or shapes" of deformities. *Id.* at 35. To support this assertion, Petitioner cites a statement in Suzuki to the effect that "all or some" of the patterns described may be used "in combination." *Id.* From this, Petitioner concludes, "Suzuki discloses applying one of the patterns disclosed in Figs. 2-20 to a first

13

Case IPR2015-01867
Patent 7,537,370

surface of the light guide and applying a different pattern to the second surface of the light guide." *Id.* at 35–36.

Patent Owner responds that Suzuki does not disclose putting deformities on both sides of the light guide where those deformities are of a different type. Prelim. Resp. 18–19. Patent Owner asserts that Suzuki's Table 1 shows that where Suzuki discloses using an embossed pattern on both sides of the light guide, the pattern is of the same type. *Id.*

We agree with Patent Owner that Suzuki does not disclose a light panel with an embossed pattern on both sides, where the pattern on one side is of a different type than on the other side. In Table 1, the samples tested either had no pattern, the embossed pattern was on a single side, or the same pattern (quadrangular pyramid or hairline) was on both sides. Ex. 1008, 9.

We are not persuaded by Petitioner's argument that it would have been obvious to alter the light panels described in Suzuki to provide different embossed patterns on the front and back surfaces of the light panel. Pet. 36. The Petition does not set forth a sufficient rationale for making this modification. The fact that Suzuki states that the various patterns can be "used in combination" (Ex. 1008, 20) does not by itself suggest using different types of patterns on the front and back surfaces. In fact, Suzuki even states that "it is not necessary" to form the embossed pattern on both sides of the panel. *Id.* at 13. Nor are we persuaded by the argument that Suzuki's reference to mixing projections and depressions or recesses would lead one of ordinary skill to use projections on one side and depressions on the other side of the panel. Pet. 36. The Petition provides no persuasive rationale for making such an alteration to the panels described in Suzuki.

14

Case IPR2015-01867
Patent 7,537,370

Moreover, we do not find the Credelle declaration helpful on this issue. The declaration, like the Petition, states these conclusions without appropriate factual support. Credell Decl. ¶¶ 134–40. For example, Mr. Credelle testifies that one pattern "may be used" on one side of the transparent light guide in Suzuki, while a different pattern "may be used" on the other side. *Id.* at ¶ 139. This testimony, however, does not explain why a person of ordinary skill would do so. Under our rules, expert testimony that does have a proper basis is entitled to little or no weight. 37 C.F.R. § 42.65(a).

We conclude from the foregoing that Petitioner has not demonstrated a reasonable likelihood of prevailing in proving that claims 1, 4, 5, 9, and 13 would have been obvious over Suzuki.

3. Claims 29 and 47

These claims do not require the patterns formed on the two sides of the light panel to be of a different type. Instead, the claims require "at least some of the light extracting deformities on or in one of the sides *vary in a different way or manner* than the light extracting deformities on or in the other side of the panel member." (Emphasis added). Suzuki discloses that the embossed patterns having different pitches may be formed on the front and back surfaces. Ex. 1008, 14. Petitioner asserts that this variation in pitch meets the above limitation. Pet. 41–42. Patent Owner responds that a difference in pitch does not allow for varying in a different manner between the front and back sides of the light panel. Prelim. Resp. 19.

We agree with Petitioner that this limitation is met by Suzuki. The '370 patent discusses varying the "density" of deformities to control the light output. Ex. 1001, co. 4, ll. 62–65. Elsewhere, the patent describes varying

15

Case IPR2015-01867
Patent 7,537,370

the "percentages and/or size" of deformities in a given area to control the light output. *Id.* at col. 5, ll. 5–7. We understand these references to "density" and "percentages" to express a difference in pitch. Therefore, we are not persuaded by Patent Owner's argument that a difference in pitch is not sufficient to meet this limitation.

Claim 47 contains the additional requirement that the panel member have a "transition region between the at least on input edge and the patterns of light extracting deformities to allow the light from the at least one light source to mix and spread." To meet this limitation, Petitioner relies on Suzuki's statement that the region in which the pattern is formed is "not limited" to the entire area of the light emitting surface. Pet. 39–40. Alternatively, Petitioner relies on Pristash for this feature. Pet. 52–55.

Patent Owner responds that a one-sentence disclosure in Suzuki is insufficient to support the conclusion that this limitation is met. Prelim. Resp. 20. We agree that the cited disculosure in Suzuki is insufficient to support this conclusion.

Patent Owner also asserts that Pristash does not disclose a transition region that meets the requirements of the claim. *Id.* at 15–17. Patent Owner contends that the transition region disclosed in Pristash is not positioned as called for in the claims. *Id.* This argument by Patent Owner was addressed in our institution decision and final decision in IPR2014-01096. Ex, 1027, 9; IPR-1096, Paper 40, 17–21. In both decisions we concluded that Pristash's transition region met this limitation of the claims. At this stage, Patent Owner has not presented information that persuades us that this conclusion was incorrect. We, therefore, adopt our reasoning from those decisions.

16

Case IPR2015-01867
Patent 7,537,370

Finally, we are persuaded that Petitioner has presented a sufficient rationale for combining Suzuki and Pristash.  Pet. 53–54.  Suzuki discloses that a "point light source" may be used.  Ex. 1008, 2.  Pristash discloses a transition device for converting the light from point sources to the shape of edge of a light guide.  Ex. 1007, col. 3, ll. 2–4.  We are persuaded by Petitioner that following Suzuki's suggestion to use a point light source requires reshaping the light and would, therefore, have led a person of ordinary skill to use Pristash's transition device to spread the light from the point source to the edges of the light guide.  Pet. 53–54; Credelle Decl. ¶ 170.

We conclude from the foregoing that Petitioner has demonstrated a reasonable likelihood of prevailing in proving that claim 29 would have been obvious over Suzuki and claim 47 would have been obvious over Suzuki and Pristash.

### D.  Asserted Grounds Based On Suzuki And Murata
### (Claims 1, 4, 5, and 13)

Petitioner's final ground asserts that these claims are obvious over Suzuki and Murata.  Pet. 55–57.  Petitioner relies on Murata, which is directed to an automobile tail light, for teaching a light reflector having recesses on its rear face and projections on its front face.  Pet. 56; Ex. 1011, Fig. 7.  Patent Owner responds that Petitioner has not explained why one of ordinary skill would look to a tail light patent to modify Suzuki's back light. Prelim. Resp. 23.  We agree with Patent Owner that Petitioner has not presented a sufficient rationale for combining these teachings.  Pet. 56–58. The fact that both relate to providing uniform light illumination is insufficient.  Credelle Decl. ¶ 178.  As Patent Owner points out, a different

17

Case IPR2015-01867
Patent 7,537,370

problem —reducing the size of the lamp— is addressed by Murata.  Prelim.
Resp. 23.  *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334 (Fed.
Cir. 2013) (prior art references that address different problems may not
support an inference that the skilled artisan would consult both of them
simultaneously).

We conclude from the foregoing that Petitioner has not demonstrated
a reasonable likelihood of prevailing in proving that claims 1, 4, 5 and 13
would have been obvious over Suzuki and Murata.

### E.  Statutory Time Bar - 35 U.S.C. § 315(b)

Patent Owner contends that the Petition should be denied under the
one year time-bar of 35 U.S.C. § 315(b).  Prelim Resp. 8–12.  Patent Owner
asserts that the Petition fails to name a real party-in-interest, LG, who was
served with a complaint charging infringement of the '370 patent more than
a year before this Petition was filed and therefore is barred from filing a
petition under § 315(b).  *Id.* at 10.  According to Patent Owner, this Petition
was filed by Petitioner "at the behest" of LG," thus making LG a real party-
in-interest.  *Id.* at 11.

We are not persuaded by this argument.  As the Office Trial Practice
Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2014), makes clear, an
important factor in determining real party in interest is control or the ability
to control the proceeding.  *Zoll Lifecor Corp. v. Philips Elect. North
America Corp*, IPR2013-00609 (PTAB Mar. 20, 2014), Paper 15 slip op. at
10.  In *Zoll*, the Board relied on the fact that the party determined to be a real
party-in-interest (Zoll Medical) controlled the petitioner (Zoll Lifecor).

Patent Owner has provided insufficient evidence of control of this
proceeding by LG.  Patent Owner, therefore, fails to provide convincing

18

Case IPR2015-01867
Patent 7,537,370

evidence at this stage that LG is a real party-in-interest.  Patent Owner's argument is based on the timing of the petition filing in relation to its pending district court action against LG, and the fact that Petitioner is a supplier to LG of certain components used in products accused of infringement.  Prelim. Resp. 10–12.  This is not sufficient proof of control.  Nor does the mere fact that Petitioner is a supplier to LG establish privity.  *Id.* at 12.

We, therefore, determine that the Petition should not be denied on this ground.


## III.  SUMMARY

The information presented shows there is a reasonable likelihood that Petitioner will prevail on the challenge to patentability of claims 29 and 47 the '370 patent based on obviousness over Suzuki and Pristash.

The information presented does not show there is a reasonable likelihood that Petitioner will prevail on any of the other grounds in the Petition.

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim or the construction of any claim term.


## IV.  ORDER

It is, therefore,

ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted on the following ground:

19

Case IPR2015-01867
Patent 7,537,370

Obviousness of claims 29 and 47 of the '370 patent over Suzuki and Pristash;

FURTHER ORDERED that no other proposed grounds of unpatentability are authorized; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this decision.

20

Case IPR2015-01867
Patent 7,537,370

PETITIONER:

Robert G. Pluta
Amanda K. Streff
Baldine B. Paul
Anita Y. Lam
MAYER BROWN LLP
rpluta@mayerbrown.com
astreff@mayerbrown.com
bpaul@mayerbrown.com
alam@mayerbrown.com
ssiddiqui@mayerbrown.com


PATENT OWNER:

Justin B. Kimble
BRAGALONE CONROY P.C.
jkimble@bcpc-law.com

21